(Slip Opinion)     OCTOBER  TERM,  2010          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BROWN, GOVERNOR OF CALIFORNIA, ET AL. *v.* PLATA ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURTS FOR THE EASTERN AND NORTHERN DISTRICTS OF CALIFORNIA

No. 09–1233.   Argued November 30, 2010—Decided May 23, 2011

California's prisons are designed to house a population just under 80,000, but at the time of the decision under review the population was almost double that.  The resulting conditions are the subject of two federal class actions.  In *Coleman* v. *Brown,* filed in 1990, the District Court found that prisoners with serious mental illness do not receive minimal, adequate care.  A Special Master appointed to oversee remedial efforts reported 12 years later that the state of mental health care in California's prisons was deteriorating due to increased overcrowding.  In *Plata* v. *Brown*, filed in 2001, the State conceded that deficiencies in prison medical care violated prisoners' Eighth Amendment rights and stipulated to a remedial injunction.  But when the State had not complied with the injunction by 2005, the court appointed a Receiver to oversee remedial efforts.  Three years later, the Receiver described continuing deficiencies caused by overcrowding.  Believing that a remedy for unconstitutional medical and mental health care could not be achieved without reducing overcrowding, the *Coleman* and *Plata* plaintiffs moved their respective District Courts to convene a three-judge court empowered by the Prison Litigation Reform Act of 1995 (PLRA) to order reductions in the prison population.  The judges in both actions granted the request, and the cases were consolidated before a single three-judge court. After hearing testimony and making extensive findings of fact, the court ordered California to reduce its prison population to 137.5% of design capacity within two years.  Finding that the prison population would have to be reduced if capacity could not be increased through new construction, the court ordered the State to formulate a compliance plan and submit it for court approval.

*Held*:

1. The court-mandated population limit is necessary to remedy the violation of prisoners' constitutional rights and is authorized by the PLRA. Pp. 12–41.

(a) If a prison deprives prisoners of basic sustenance, including adequate medical care, the courts have a responsibility to remedy the resulting Eighth Amendment violation. See *Hutto* v. *Finney*, 437 U. S. 678, 687, n. 9. They must consider a range of options, including the appointment of special masters or receivers, the possibility of consent decrees, and orders limiting a prison's population. Under the PLRA, only a three-judge court may limit a prison population. 18 U. S. C. §3626(a)(3). Before convening such a court, a district court must have entered an order for less intrusive relief that failed to remedy the constitutional violation and must have given the defendant a reasonable time to comply with its prior orders. §3626(a)(3)(A). Once convened, the three-judge court must find by clear and convincing evidence that "crowding is the primary cause of the violation" and "no other relief will remedy [the] violation," §3626(a)(3)(E); and that the relief is "narrowly drawn, extends no further than necessary. . . , and is the least intrusive means necessary to correct the violation," §3626(a)(1)(A). The court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Ibid.* Its legal determinations are reviewed *de novo*, but its factual findings are reviewed for clear error. Pp. 12–15.

(b) The *Coleman* and *Plata* courts acted reasonably in convening a three-judge court. Pp. 15–19.

(1) The merits of the decision to convene are properly before this Court, which has exercised its 28 U. S. C. §1253 jurisdiction to determine the authority of a court below, including whether a three-judge court was properly constituted. *Gonzalez* v. *Automatic Employees Credit Union*, 419 U. S. 90, 95, n. 12. Pp. 15–16.

(2) Section 3626(a)(3)(A)(i)'s previous order requirement was satisfied in *Coleman* by the Special Master's 1995 appointment and in *Plata* by the 2002 approval of a consent decree and stipulated injunction. Both orders were intended to remedy constitutional violations and were given ample time to succeed—12 years in *Coleman*, and 5 years in *Plata*. Contrary to the State's claim, §3626(a)(3)(A)(ii)'s reasonable time requirement did not require the District Courts to give more time for subsequent remedial efforts to succeed. Such a reading would in effect require courts to impose a moratorium on new remedial orders before issuing a population limit, which would delay an eventual remedy, prolong the courts' involvement, and serve neither the State nor the prisoners. The *Coleman*

and *Plata* courts had a solid basis to doubt that additional efforts to build new facilities and hire new staff would achieve a remedy, given the ongoing deficiencies recently reported by both the Special Master and the Receiver. Pp. 16–19.

(c) The three-judge court did not err in finding that "crowding [was] the primary cause of the violation," §3626(a)(3)(E)(i). Pp. 19–29.

(1) The trial record documents the severe impact of burgeoning demand on the provision of care. The evidence showed that there were high vacancy rates for medical and mental health staff, *e.g.,* 20% for surgeons and 54.1% for psychiatrists; that these numbers understated the severity of the crisis because the State has not budgeted sufficient staff to meet demand; and that even if vacant positions could be filled, there would be insufficient space for the additional staff. Such a shortfall contributes to significant delays in treating mentally ill prisoners, who are housed in administrative segregation for extended periods while awaiting transfer to scarce mental health treatment beds. There are also backlogs of up to 700 prisoners waiting to see a doctor for physical care. Crowding creates unsafe and unsanitary conditions that hamper effective delivery of medical and mental health care. It also promotes unrest and violence and can cause prisoners with latent mental illnesses to worsen and develop overt symptoms. Increased violence requires increased reliance on lockdowns to keep order, and lockdowns further impede the effective delivery of care. Overcrowding's effects are particularly acute in prison reception centers, which process 140,000 new or returning prisoners annually, and which house some prisoners for their entire incarceration period. Numerous experts testified that crowding is the primary cause of the constitutional violations. Pp. 19–24.

(2) Contrary to the State's claim, the three-judge court properly admitted, cited, and considered evidence of current prison conditions as relevant to the issues before it. Expert witnesses based their conclusions on recent observations of prison conditions; the court admitted recent reports on prison conditions by the Receiver and Special Master; and both parties presented testimony related to current conditions. The court's orders cutting off discovery a few months before trial and excluding evidence not pertinent to the issue whether a population limit is appropriate under the PLRA were within the court's sound discretion. Orderly trial management may require discovery deadlines and a clean distinction between litigation of the merits and the remedy. The State points to no significant evidence that it was unable to present and that would have changed the outcome here. Pp. 24–26.

(3) It was permissible for the three-judge court to conclude that

overcrowding was the "primary," but not the only, cause of the violations, and that reducing crowding would not entirely cure the violations. This understanding of the primary cause requirement is consistent with the PLRA. Had Congress intended to require that crowding be the only cause, the PLRA would have said so. Pp. 26–29.

(d) The evidence supports the three-judge court's finding that "no other relief [would] remedy the violation," §3626(a)(3)(E)(ii). The State's claim that out-of-state transfers provide a less restrictive alternative to a population limit must fail because requiring transfers is a population limit under the PLRA. Even if they could be regarded as a less restrictive alternative, the three-judge court found no evidence of plans for transfers in numbers sufficient to relieve overcrowding. The court also found no realistic possibility that California could build itself out of this crisis, particularly given the State's ongoing fiscal problems. Further, it rejected additional hiring as a realistic alternative, since the prison system was chronically understaffed and would have insufficient space were adequate personnel retained. The court also did not err when it concluded that, absent a population reduction, the Receiver's and Special Master's continued efforts would not achieve a remedy. Their reports are persuasive evidence that, with no reduction, any remedy might prove unattainable and would at the very least require vast expenditures by the State. The State asserts that these measures would succeed if combined, but a long history of failed remedial orders, together with substantial evidence of overcrowding's deleterious effects on the provision of care, compels a different conclusion here. Pp. 29–33.

(e) The prospective relief ordered here was narrowly drawn, extended no further than necessary to correct the violation, and was the least intrusive means necessary to correct the violation. Pp. 33–41.

(1) The population limit does not fail narrow tailoring simply because prisoners beyond the plaintiff class will have to be released through parole or sentencing reform in order to meet the required reduction. While narrow tailoring requires a " ' "fit" between the [remedy's] ends and the means chosen to accomplish those ends,' " *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 480, a narrow and otherwise proper remedy for a constitutional violation is not invalid simply because it will have collateral effects. Nor does the PLRA require that result. The order gives the State flexibility to determine who should be released, and the State could move the three-judge court to modify its terms. The order also is not overbroad because it encompasses the entire prison system, rather than separately assessing each institution's need for a population limit. The *Coleman* court found a systemwide violation, and the State stipulated to systemwide relief in *Plata*. Assuming no constitutional violation

Syllabus

results, some facilities may retain populations in excess of the 137.5% limit provided others fall sufficiently below it so the system as a whole remains in compliance with the order. This will afford the State flexibility to accommodate differences between institutions. The order may shape or control the State's authority in the realm of prison administration, but it leaves much to the State's discretion. The order's limited scope is necessary to remedy a constitutional violation. The State may move the three-judge court to modify its order, but it has proposed no realistic alternative remedy at this time. Pp. 33–36.

    (2) The three-judge court gave "substantial weight" to any potential adverse impact on public safety from its order. The PLRA's "substantial weight" requirement does not require the court to certify that its order has no possible adverse impact on the public. Here, statistical evidence showed that prison populations had been lowered without adversely affecting public safety in some California counties, several States, and Canada. The court found that various available methods of reducing overcrowding—good time credits and diverting low-risk offenders to community programs—would have little or no impact on public safety, and its order took account of such concerns by giving the State substantial flexibility to select among the means of reducing overcrowding. The State complains that the court approved the State's population reduction plan without considering whether its specific measures would substantially threaten public safety. But the court left state officials the choice of how best to comply and was not required to second-guess their exercise of discretion. Developments during the pendency of this appeal, when the State has begun to reduce the prison population, support the conclusion that a reduction can be accomplished without an undue negative effect on public safety. Pp. 37–41.

  2. The three-judge court's order, subject to the State's right to seek its modification in appropriate circumstances, must be affirmed. Pp. 41–48.

    (a) To comply with the PLRA, a court must set a population limit at the highest level consistent with an efficacious remedy, and it must order the population reduction to be achieved in the shortest period of time reasonably consistent with public safety. Pp. 41–42.

    (b) The three-judge court's conclusion that the prison population should be capped at 137.5% of design capacity was not clearly erroneous. The court concluded that the evidence supported a limit between the 130% limit supported by expert testimony and the Federal Bureau of Prisons and the 145% limit recommended by the State Corrections Independent Review Panel. The PLRA's narrow tailoring requirement is satisfied so long as such equitable, remedial judg-

Syllabus

ments are made with the objective of releasing the fewest possible prisoners consistent with an efficacious remedy. Pp. 42–44.

(c) The three-judge court did not err in providing a 2-year deadline for relief, especially in light of the State's failure to contest the issue at trial. The State has not asked this Court to extend the deadline, but the three-judge court has the authority, and responsibility, to amend its order as warranted by the exercise of sound discretion. Proper respect for the State and for its governmental processes require that court to exercise its jurisdiction to accord the State considerable latitude to find mechanisms and make plans that will promptly and effectively correct the violations consistent with public safety. The court may, *e.g.,* grant a motion to extend the deadline if the State meets appropriate preconditions designed to ensure that the plan will be implemented without undue delay. Such observations reflect the fact that the existing order, like all ongoing equitable relief, must remain open to appropriate modification, and are not intended to cast doubt on the validity of the order's basic premise. Pp. 44–48.

Affirmed.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 09–1233

―――――――

## EDMUND G. BROWN, JR., GOVERNOR OF CALIFORNIA, ET AL., APPELLANTS *v.* MARCIANO PLATA ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURTS FOR THE EASTERN DISTRICT AND THE NORTHERN DISTRICT OF CALIFORNIA

[May 23, 2011]

JUSTICE KENNEDY delivered the opinion of the Court.

This case arises from serious constitutional violations in California's prison system. The violations have persisted for years. They remain uncorrected. The appeal comes to this Court from a three-judge District Court order directing California to remedy two ongoing violations of the Cruel and Unusual Punishments Clause, a guarantee binding on the States by the Due Process Clause of the Fourteenth Amendment. The violations are the subject of two class actions in two Federal District Courts. The first involves the class of prisoners with serious mental disorders. That case is *Coleman* v. *Brown.* The second involves prisoners with serious medical conditions. That case is *Plata* v. *Brown.* The order of the three-judge District Court is applicable to both cases.

After years of litigation, it became apparent that a remedy for the constitutional violations would not be effective absent a reduction in the prison system population. The authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amend-

ment is a power reserved to a three-judge district court, not a single-judge district court. 18 U. S. C. §3626(a). In accordance with that rule, the *Coleman* and *Plata* District Judges independently requested that a three-judge court be convened. The Chief Judge of the Court of Appeals for the Ninth Circuit convened a three-judge court composed of the *Coleman* and *Plata* District Judges and a third, Ninth Circuit Judge. Because the two cases are interrelated, their limited consolidation for this purpose has a certain utility in avoiding conflicting decrees and aiding judicial consideration and enforcement. The State in this Court has not objected to consolidation, although the State does argue that the three-judge court was prematurely convened. The State also objects to the substance of the three-judge court order, which requires the State to reduce overcrowding in its prisons.

The appeal presents the question whether the remedial order issued by the three-judge court is consistent with requirements and procedures set forth in a congressional statute, the Prison Litigation Reform Act of 1995 (PLRA). 18 U. S. C. §3626; see Appendix A, *infra.* The order leaves the choice of means to reduce overcrowding to the discretion of state officials. But absent compliance through new construction, out-of-state transfers, or other means—or modification of the order upon a further showing by the State—the State will be required to release some number of prisoners before their full sentences have been served. High recidivism rates must serve as a warning that mistaken or premature release of even one prisoner can cause injury and harm. The release of prisoners in large numbers—assuming the State finds no other way to comply with the order—is a matter of undoubted, grave concern.

At the time of trial, California's correctional facilities held some 156,000 persons. This is nearly double the number that California's prisons were designed to hold, and California has been ordered to reduce its prison popu-

lation to 137.5% of design capacity. By the three-judge court's own estimate, the required population reduction could be as high as 46,000 persons. Although the State has reduced the population by at least 9,000 persons during the pendency of this appeal, this means a further reduction of 37,000 persons could be required. As will be noted, the reduction need not be accomplished in an indiscriminate manner or in these substantial numbers if satisfactory, alternate remedies or means for compliance are devised. The State may employ measures, including good-time credits and diversion of low-risk offenders and technical parole violators to community-based programs, that will mitigate the order's impact. The population reduction potentially required is nevertheless of unprecedented sweep and extent.

Yet so too is the continuing injury and harm resulting from these serious constitutional violations. For years the medical and mental health care provided by California's prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners' basic health needs. Needless suffering and death have been the well-documented result. Over the whole course of years during which this litigation has been pending, no other remedies have been found to be sufficient. Efforts to remedy the violation have been frustrated by severe overcrowding in California's prison system. Short term gains in the provision of care have been eroded by the long-term effects of severe and pervasive overcrowding.

Overcrowding has overtaken the limited resources of prison staff; imposed demands well beyond the capacity of medical and mental health facilities; and created unsanitary and unsafe conditions that make progress in the provision of care difficult or impossible to achieve. The overcrowding is the "primary cause of the violation of a Federal right," 18 U. S. C. §3626(a)(3)(E)(i), specifically the severe and unlawful mistreatment of prisoners

through grossly inadequate provision of medical and mental health care.

This Court now holds that the PLRA does authorize the relief afforded in this case and that the court-mandated population limit is necessary to remedy the violation of prisoners' constitutional rights. The order of the three-judge court, subject to the right of the State to seek its modification in appropriate circumstances, must be affirmed.

## I
## A

The degree of overcrowding in California's prisons is exceptional. California's prisons are designed to house a population just under 80,000, but at the time of the three-judge court's decision the population was almost double that. The State's prisons had operated at around 200% of design capacity for at least 11 years. Prisoners are crammed into spaces neither designed nor intended to house inmates. As many as 200 prisoners may live in a gymnasium, monitored by as few as two or three correctional officers. App. 1337–1338, 1350; see Appendix B, *infra.* As many as 54 prisoners may share a single toilet. App. 1337.

The Corrections Independent Review Panel, a body appointed by the Governor and composed of correctional consultants and representatives from state agencies, concluded that California's prisons are "'severely overcrowded, imperiling the safety of both correctional employees and inmates.'"[1] Juris. Statement App., O. T. 2009,

---

[1] A similar conclusion was reached by the Little Hoover Commission, a bipartisan and independent state body, which stated that "[o]vercrowded conditions inside the prison walls are unsafe for inmates and staff," Solving California's Corrections Crisis: Time is Running Out 17 (Jan. 2007), and that "California's correctional system is in a tailspin," *id.,* at i.

No. 09–416, p. 56a (hereinafter Juris. App.). In 2006, then-Governor Schwarzenegger declared a state of emergency in the prisons, as "'immediate action is necessary to prevent death and harm caused by California's severe prison overcrowding.'" *Id.,* at 61a. The consequences of overcrowding identified by the Governor include "'increased, substantial risk for transmission of infectious illness'" and a suicide rate "'approaching an average of one per week.'" *Ibid.*

Prisoners in California with serious mental illness do not receive minimal, adequate care. Because of a shortage of treatment beds, suicidal inmates may be held for prolonged periods in telephone-booth sized cages without toilets. See Appendix C, *infra.* A psychiatric expert reported observing an inmate who had been held in such a cage for nearly 24 hours, standing in a pool of his own urine, unresponsive and nearly catatonic. Prison officials explained they had "'no place to put him.'" App. 593.

_____

At trial, current and former California prison officials also testified to the degree of overcrowding. Jeanne Woodford, who recently administered California's prison system, stated that "'[o]vercrowding in the [California Department of Corrections and Rehabilitation (CDCR)] is extreme, its effects are pervasive and it is preventing the Department from providing adequate mental and medical health care to prisoners.'" Juris. App. 84a. Matthew Cate, the head of the California prison system, stated that "'overpopulation makes everything we do more difficult.'" *Ibid.* And Robin Dezember, chief deputy secretary of Correctional Healthcare Services, stated that "we are terribly overcrowded in our prison system" and "overcrowding has negative effects on everybody in the prison system." Tr. 853, 856.

Experts from outside California offered similar assessments. Doyle Wayne Scott, the former head of corrections in Texas, described conditions in California's prisons as "appalling," "inhumane," and "unacceptable" and stated that "[i]n more than 35 years of prison work experience, I have never seen anything like it." App. 1337. Joseph Lehman, the former head of correctional systems in Washington, Maine, and Pennsylvania, concluded that "[t]here is no question that California's prisons are overcrowded" and that "this is an emergency situation; it calls for drastic and immediate action." *Id.,* at 1312.

Other inmates awaiting care may be held for months in administrative segregation, where they endure harsh and isolated conditions and receive only limited mental health services. Wait times for mental health care range as high as 12 months. *Id.,* at 704. In 2006, the suicide rate in California's prisons was nearly 80% higher than the national average for prison populations; and a court-appointed Special Master found that 72.1% of suicides involved "some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable."[2] *Id.,* at 1781.

Prisoners suffering from physical illness also receive severely deficient care. California's prisons were designed to meet the medical needs of a population at 100% of design capacity and so have only half the clinical space needed to treat the current population. *Id.,* at 1024. A correctional officer testified that, in one prison, up to 50 sick inmates may be held together in a 12- by 20-foot cage for up to five hours awaiting treatment. Tr. 597–599. The number of staff is inadequate, and prisoners face significant delays in access to care. A prisoner with severe abdominal pain died after a 5-week delay in referral to a specialist; a prisoner with "constant and extreme" chest

---

[2] At the time of the three-judge court's decision, 2006 was the most recent year for which the Special Master had conducted a detailed study of suicides in the California prisons. The Special Master later issued an analysis for the year 2007. This report concluded that the 2007 suicide rate was "a continuation of the CDCR's pattern of exceeding the national prison suicide rate." Record in No. 2:90–CV–00520–LKK–JFM (ED/ND Cal.), Doc. 3677, p. 1. The report found that the rate of suicides involving inadequate assessment, treatment, or intervention had risen to 82% and concluded that "[t]hese numbers clearly indicate no improvement in this area during the past several years, and possibly signal a trend of ongoing deterioration." *Id.,* at 12. No detailed study has been filed since then, but in September 2010 the Special Master filed a report stating that "the data for 2010 so far is not showing improvement in suicide prevention." App. 868.

pain died after an 8-hour delay in evaluation by a doctor; and a prisoner died of testicular cancer after a "failure of MDs to work up for cancer in a young man with 17 months of testicular pain."[3] California Prison Health Care Receivership Corp., K. Imai, Analysis of CDCR Death Reviews 2006, pp. 6–7 (Aug. 2007). Doctor Ronald Shansky, former medical director of the Illinois state prison system, surveyed death reviews for California prisoners. He concluded that extreme departures from the standard of care were "widespread," Tr. 430, and that the proportion of "possibly preventable or preventable" deaths was "extremely high." *Id.,* at 429.[4] Many more prisoners, suffer-

———————

[3] Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay—or any other particular deficiency in medical care complained of by the plaintiffs—would violate the Constitution under *Estelle* v. *Gamble*, 429 U. S. 97, 104–105 (1976), if considered in isolation. Plaintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to "substantial risk of serious harm" and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society. *Farmer* v. *Brennan*, 511 U. S. 825, 834 (1994).

[4] In 2007, the last year for which the three-judge court had available statistics, an analysis of deaths in California's prisons found 68 preventable or possibly preventable deaths. California Prison Health Care Receivership Corp., K. Imai, Analysis of Year 2007 Death Reviews 18 (Nov. 2008). This was essentially unchanged from 2006, when an analysis found 66 preventable or possibly preventable deaths. *Ibid.* These statistics mean that, during 2006 and 2007, a preventable or possibly preventable death occurred once every five to six days.

Both preventable and possibly preventable deaths involve major lapses in medical care and are a serious cause for concern. In one typical case classified as a possibly preventable death, an analysis revealed the following lapses: "16 month delay in evaluating abnormal liver mass; 8 month delay in receiving regular chemotherapy . . . ; multiple providers fail to respond to jaundice and abnormal liver function tests causing 17 month delay in diagnosis." California Prison Health Care Receivership Corp., K. Imai, Analysis of Year 2009 Inmate Death Reviews—California Prison Health Care System 12 (Sept. 2010)

ing from severe but not life-threatening conditions, experience prolonged illness and unnecessary pain.

## B

These conditions are the subject of two federal cases. The first to commence, *Coleman* v. *Brown*, was filed in 1990. *Coleman* involves the class of seriously mentally ill persons in California prisons. Over 15 years ago, in 1995, after a 39-day trial, the *Coleman* District Court found "overwhelming evidence of the systematic failure to deliver necessary care to mentally ill inmates" in California prisons. *Coleman* v. *Wilson*, 912 F. Supp. 1282, 1316 (ED Cal.). The prisons were "seriously and chronically understaffed," *id.,* at 1306, and had "no effective method for ensuring . . . the competence of their staff," *id.,* at 1308. The prisons had failed to implement necessary suicide-prevention procedures, "due in large measure to the severe understaffing." *Id.,* at 1315. Mentally ill inmates "languished for months, or even years, without access to necessary care." *Id.,* at 1316. "They suffer from severe hallucinations, [and] they decompensate into catatonic states." *Ibid.* The court appointed a Special Master to oversee development and implementation of a remedial plan of action.

In 2007, 12 years after his appointment, the Special

──────────

(hereinafter 2009 Death Reviews).

The three-judge court did not have access to statistics for 2008, but in that year the number of preventable or possibly preventable deaths held steady at 66. California Prison Health Care Receivership Corp., K. Imai, Analysis of Year 2008 Death Reviews 9 (Dec. 2009). In 2009, the number of preventable or possibly preventable deaths dropped to 46. 2009 Death Reviews 11, 13. The three-judge court could not have anticipated this development, and it would be inappropriate for this Court to evaluate its significance for the first time on appeal. The three-judge court should, of course, consider this and any other evidence of improved conditions when considering future requests by the State for modification of its order. See *infra*, at 45–48.

Master in *Coleman* filed a report stating that, after years of slow improvement, the state of mental health care in California's prisons was deteriorating. App. 489. The Special Master ascribed this change to increased overcrowding. The rise in population had led to greater demand for care, and existing programming space and staffing levels were inadequate to keep pace. Prisons had retained more mental health staff, but the "growth of the resource [had] not matched the rise in demand." *Id.,* at 482. At the very time the need for space was rising, the need to house the expanding population had also caused a "reduction of programming space now occupied by inmate bunks." *Id.,* at 479. The State was "facing a four to five-year gap in the availability of sufficient beds to meet the treatment needs of many inmates/patients." *Id.,* at 481. "[I]ncreasing numbers of truly psychotic inmate/patients are trapped in [lower levels of treatment] that cannot meet their needs." *Ibid.* The Special Master concluded that many early "achievements have succumbed to the inexorably rising tide of population, leaving behind growing frustration and despair." *Id.,* at 489.

## C

The second action, *Plata* v. *Brown*, involves the class of state prisoners with serious medical conditions. After this action commenced in 2001, the State conceded that deficiencies in prison medical care violated prisoners' Eighth Amendment rights. The State stipulated to a remedial injunction. The State failed to comply with that injunction, and in 2005 the court appointed a Receiver to oversee remedial efforts. The court found that "the California prison medical care system is broken beyond repair," resulting in an "unconscionable degree of suffering and death." App. 917. The court found: "[I]t is an uncontested fact that, on average, an inmate in one of California's prisons needlessly dies every six to seven days due to

constitutional deficiencies in the [California prisons']
medical delivery system." *Ibid.* And the court made
findings regarding specific instances of neglect, including
the following:

> "[A] San Quentin prisoner with hypertension, diabetes
> and renal failure was prescribed two different medica-
> tions that actually served to exacerbate his renal fail-
> ure. An optometrist noted the patient's retinal bleed-
> ing due to very high blood pressure and referred him
> for immediate evaluation, but this evaluation never
> took place. It was not until a year later that the pa-
> tient's renal failure was recognized, at which point he
> was referred to a nephrologist on an urgent basis;
> he should have been seen by the specialist within 14
> days but the consultation never happened and the pa-
> tient died three months later." *Id.,* at 928 (citations
> omitted).

Prisons were unable to retain sufficient numbers of com-
petent medical staff, *id.*, at 937, and would "hire any
doctor who had 'a license, a pulse and a pair of shoes,'" *id.*,
at 926. Medical facilities lacked "necessary medical equip-
ment" and did "not meet basic sanitation standards." *Id.*,
at 944. "Exam tables and counter tops, where prisoners
with . . . communicable diseases are treated, [were] not
routinely disinfected." *Ibid.*

  In 2008, three years after the District Court's decision,
the Receiver described continuing deficiencies in the
health care provided by California prisons:

> "Timely access is not assured. The number of medical
> personnel has been inadequate, and competence has
> not been assured. . . . Adequate housing for the dis-
> abled and aged does not exist. The medical facilities,
> when they exist at all, are in an abysmal state of dis-
> repair. Basic medical equipment is often not available
> or used. Medications and other treatment options are

too often not available when needed. . . .  Indeed, it is a misnomer to call the existing chaos a 'medical delivery system'—it is more an act of desperation than a system."  Record in No. 3:01–CV–01351–TEH (ND Cal.), Doc. 1136, p. 5.

A report by the Receiver detailed the impact of overcrowding on efforts to remedy the violation.  The Receiver explained that "overcrowding, combined with staffing shortages, has created a culture of cynicism, fear, and despair which makes hiring and retaining competent clinicians extremely difficult."  App. 1031.  "[O]vercrowding, and the resulting day to day operational chaos of the [prison system], creates regular 'crisis' situations which . . . take time [and] energy . . . away from important remedial programs."  *Id.*, at 1035.  Overcrowding had increased the incidence of infectious disease, *id.*, at 1037–1038, and had led to rising prison violence and greater reliance by custodial staff on lockdowns, which "inhibit the delivery of medical care and increase the staffing necessary for such care."  *Id.*, at 1037.  "Every day," the Receiver reported, "California prison wardens and health care managers make the difficult decision as to which of the class actions, *Coleman* . . . or *Plata* they will fail to comply with because of staff shortages and patient loads."  *Id.*, at 1038.

D

The *Coleman* and *Plata* plaintiffs, believing that a remedy for unconstitutional medical and mental health care could not be achieved without reducing overcrowding, moved their respective District Courts to convene a three-judge court empowered under the PLRA to order reductions in the prison population.  The judges in both actions granted the request, and the cases were consolidated before a single three-judge court.  The State has not challenged the validity of the consolidation in proceedings before this Court, so its propriety is not presented by this

appeal.

The three-judge court heard 14 days of testimony and issued a 184-page opinion, making extensive findings of fact. The court ordered California to reduce its prison population to 137.5% of the prisons' design capacity within two years. Assuming the State does not increase capacity through new construction, the order requires a population reduction of 38,000 to 46,000 persons. Because it appears all but certain that the State cannot complete sufficient construction to comply fully with the order, the prison population will have to be reduced to at least some extent. The court did not order the State to achieve this reduction in any particular manner. Instead, the court ordered the State to formulate a plan for compliance and submit its plan for approval by the court.

The State appealed to this Court pursuant to 28 U. S. C. §1253, and the Court postponed consideration of the question of jurisdiction to the hearing on the merits. *Schwarzenegger* v. *Plata*, 560 U. S. ___ (2010).

## II

As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. "'The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.'" *Atkins* v. *Virginia*, 536 U. S. 304, 311 (2002) (quoting *Trop* v. *Dulles*, 356 U. S. 86, 100 (1958) (plurality opinion)).

To incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. A prison's failure to provide sustenance for inmates "may

actually produce physical 'torture or a lingering death.'" *Estelle* v. *Gamble*, 429 U. S. 97, 103 (1976) (quoting *In re Kemmler*, 136 U. S. 436, 447 (1890)); see generally A. Elsner, Gates of Injustice: The Crisis in America's Prisons (2004). Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.

If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation. See *Hutto* v. *Finney*, 437 U. S. 678, 687, n. 9 (1978). Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals. See *Bell* v. *Wolfish*, 441 U. S. 520, 547–548 (1979). Courts nevertheless must not shrink from their obligation to "enforce the constitutional rights of all 'persons,' including prisoners." *Cruz* v. *Beto*, 405 U. S. 319, 321 (1972) *(per curiam)*. Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.

Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers and the possibility of consent decrees. When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population. By its terms, the PLRA restricts the circumstances in which a court may enter an order "that has the purpose or effect of reducing or limiting the prison population." 18 U. S. C. §3626(g)(4). The order in this case does not necessarily require the State to release any prisoners. The State may comply by raising the design

capacity of its prisons or by transferring prisoners to county facilities or facilities in other States. Because the order limits the prison population as a percentage of design capacity, it nonetheless has the "effect of reducing or limiting the prison population." *Ibid.*

Under the PLRA, only a three-judge court may enter an order limiting a prison population. §3626(a)(3)(B). Before a three-judge court may be convened, a district court first must have entered an order for less intrusive relief that failed to remedy the constitutional violation and must have given the defendant a reasonable time to comply with its prior orders. §3626(a)(3)(A). The party requesting a three-judge court must then submit "materials sufficient to demonstrate that [these requirements] have been met." §3626(a)(3)(C). If the district court concludes that the materials are, in fact, sufficient, a three-judge court may be convened. *Ibid.;* see also 28 U. S. C. §2284(b)(1) (stating that a three-judge court may not be convened if the district court "determines that three judges are not required"); 17A C. Wright, A. Miller, E. Cooper, & V. Amar, Federal Practice and Procedure §4235 (3d ed. 2007).

The three-judge court must then find by clear and convincing evidence that "crowding is the primary cause of the violation of a Federal right" and that "no other relief will remedy the violation of the Federal right." 18 U. S. C. §3626(a)(3)(E). As with any award of prospective relief under the PLRA, the relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." §3626(a)(1)(A). The three-judge court must therefore find that the relief is "narrowly drawn, extends no further than necessary . . . , and is the least intrusive means necessary to correct the violation of the Federal right." *Ibid.* In making this determination, the three-judge court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."

*Ibid.* Applying these standards, the three-judge court found a population limit appropriate, necessary, and authorized in this case.

This Court's review of the three-judge court's legal determinations is *de novo*, but factual findings are reviewed for clear error. See *Anderson* v. *Bessemer City*, 470 U. S. 564, 573–574 (1985). Deference to trial court fact-finding reflects an understanding that "[t]he trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Id.*, at 574. The three-judge court oversaw two weeks of trial and heard at considerable length from California prison officials, as well as experts in the field of correctional administration. The judges had the opportunity to ask relevant questions of those witnesses. Two of the judges had overseen the ongoing remedial efforts of the Receiver and Special Master. The three-judge court was well situated to make the difficult factual judgments necessary to fashion a remedy for this complex and intractable constitutional violation. The three-judge court's findings of fact may be reversed only if this Court is left with a "'definite and firm conviction that a mistake has been committed.'" *Id.,* at 573 (quoting *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948)).

A

The State contends that it was error to convene the three-judge court without affording it more time to comply with the prior orders in *Coleman* and *Plata*.

1

The parties dispute this Court's jurisdiction to review the determinations of the *Coleman* and *Plata* District Courts that a three-judge court should be convened. Plaintiffs claim the State was required to raise this issue first in the Court of Appeals by appealing the orders of the

District Courts. When exercising jurisdiction under 28
U. S. C. §1253, however, this Court "has not hesitated to
exercise jurisdiction 'to determine the authority of the
court below,'" including whether the three-judge court was
properly constituted. *Gonzalez* v. *Automatic Employees
Credit Union*, 419 U. S. 90, 95, n. 12 (1974) (quoting *Bailey*
v. *Patterson*, 369 U. S. 31, 34 (1962) *(per curiam)*); see also
*Gully* v. *Interstate Natural Gas Co.*, 292 U. S. 16, 18 (1934)
*(per curiam)* ("The case is analogous to those in which this
Court, finding that the court below has acted without
jurisdiction, exercises its appellate jurisdiction to correct
the improper action"). The merits of the decision to con-
vene the three-judge court, therefore, are properly before
this Court.

2

Before a three-judge court may be convened to consider
whether to enter a population limit, the PLRA requires
that the court have "previously entered an order for less
intrusive relief that has failed to remedy the deprivation
of the Federal right sought to be remedied." 18 U. S. C.
§3626(a)(3)(A)(i). This provision refers to "an order." It
is satisfied if the court has entered one order, and this sin-
gle order has "failed to remedy" the constitutional viola-
tion. The defendant must also have had "a reasonable
amount of time to comply with the previous court orders."
§3626(a)(3)(A)(ii). This provision refers to the court's
"orders." It requires that the defendant have been given a
reasonable time to comply with all of the court's orders.
Together, these requirements ensure that the "'last resort
remedy'" of a population limit is not imposed "'as a first
step.'" *Inmates of Occoquan* v. *Barry*, 844 F. 2d 828, 843
(CADC 1988).

The first of these conditions, the previous order re-
quirement of §3626(a)(3)(A)(i), was satisfied in *Coleman*
by appointment of a Special Master in 1995, and it was

satisfied in *Plata* by approval of a consent decree and stipulated injunction in 2002. Both orders were intended to remedy the constitutional violations. Both were given ample time to succeed. When the three-judge court was convened, 12 years had passed since the appointment of the *Coleman* Special Master, and 5 years had passed since the approval of the *Plata* consent decree. The State does not claim that either order achieved a remedy. Although the PLRA entitles a State to terminate remedial orders such as these after two years unless the district court finds that the relief "remains necessary to correct a current and ongoing violation of the Federal right," §3626(b)(3), California has not attempted to obtain relief on this basis.

The State claims instead that the second condition, the reasonable time requirement of §3626(a)(3)(A)(ii), was not met because other, later remedial efforts should have been given more time to succeed. In 2006, the *Coleman* District Judge approved a revised plan of action calling for construction of new facilities, hiring of new staff, and implementation of new procedures. That same year, the *Plata* District Judge selected and appointed a Receiver to oversee the State's ongoing remedial efforts. When the three-judge court was convened, the Receiver had filed a preliminary plan of action calling for new construction, hiring of additional staff, and other procedural reforms.

Although both the revised plan of action in *Coleman* and the appointment of the Receiver in *Plata* were new developments in the courts' remedial efforts, the basic plan to solve the crisis through construction, hiring, and procedural reforms remained unchanged. These efforts had been ongoing for years; the failed consent decree in *Plata* had called for implementation of new procedures and hiring of additional staff; and the *Coleman* Special Master had issued over 70 orders directed at achieving a remedy through construction, hiring, and procedural reforms. The

*Coleman* Special Master and *Plata* Receiver were unable
to provide assurance that further, substantially similar
efforts would yield success absent a population reduction.
Instead, the *Coleman* Special Master explained that
"many of the clinical advances . . . painfully accomplished
over the past decade are slip-sliding away" as a result of
overcrowding.  App. 481–482.  And the *Plata* Receiver
indicated that, absent a reduction in overcrowding, a
successful remedial effort could "all but bankrupt" the
State of California.  App. 1053.

Having engaged in remedial efforts for 5 years in *Plata*
and 12 in *Coleman*, the District Courts were not required
to wait to see whether their more recent efforts would
yield equal disappointment.  When a court attempts to
remedy an entrenched constitutional violation through
reform of a complex institution, such as this statewide
prison system, it may be necessary in the ordinary course
to issue multiple orders directing and adjusting ongoing
remedial efforts.  Each new order must be given a reason-
able time to succeed, but reasonableness must be assessed
in light of the entire history of the court's remedial efforts.
A contrary reading of the reasonable time requirement
would in effect require district courts to impose a morato-
rium on new remedial orders before issuing a population
limit.  This unnecessary period of inaction would delay an
eventual remedy and would prolong the courts' involve-
ment, serving neither the State nor the prisoners.  Con-
gress did not require this unreasonable result when it
used the term "reasonable."

The *Coleman* and *Plata* courts had a solid basis to doubt
that additional efforts to build new facilities and hire new
staff would achieve a remedy.  Indeed, although 5 years
have now passed since the appointment of the *Plata*
Receiver and approval of the revised plan of action in
*Coleman*, there is no indication that the constitutional
violations have been cured.  A report filed by the *Coleman*

Special Master in July 2009 describes ongoing violations, including an "absence of timely access to appropriate levels of care at every point in the system." App. 807. A report filed by the *Plata* Receiver in October 2010 likewise describes ongoing deficiencies in the provision of medical care and concludes that there are simply "too many prisoners for the healthcare infrastructure." *Id.*, at 1655. The *Coleman* and *Plata* courts acted reasonably when they convened a three-judge court without further delay.

## B

Once a three-judge court has been convened, the court must find additional requirements satisfied before it may impose a population limit. The first of these requirements is that "crowding is the primary cause of the violation of a Federal right." 18 U. S. C. §3626(a)(3)(E)(i).

### 1

The three-judge court found the primary cause requirement satisfied by the evidence at trial. The court found that overcrowding strains inadequate medical and mental health facilities; overburdens limited clinical and custodial staff; and creates violent, unsanitary, and chaotic conditions that contribute to the constitutional violations and frustrate efforts to fashion a remedy. The three-judge court also found that "until the problem of overcrowding is overcome it will be impossible to provide constitutionally compliant care to California's prison population." Juris. App. 141a.

The parties dispute the standard of review applicable to this determination. With respect to the three-judge court's factual findings, this Court's review is necessarily deferential. It is not this Court's place to "duplicate the role" of the trial court. *Anderson*, 470 U. S., at 573. The ultimate issue of primary cause presents a mixed question of law and fact; but there, too, "the mix weighs heavily on the

'fact' side." *Lilly* v. *Virginia*, 527 U. S. 116, 148 (1999) (Rehnquist, C. J., concurring in judgment). Because the "district court is 'better positioned' . . . to decide the issue," our review of the three-judge court's primary cause determination is deferential. *Salve Regina College* v. *Russell*, 499 U. S. 225, 233 (1991).

The record documents the severe impact of burgeoning demand on the provision of care. At the time of trial, vacancy rates for medical and mental health staff ranged as high as 20% for surgeons, 25% for physicians, 39% for nurse practitioners, and 54.1% for psychiatrists. Juris. App. 105a, 108a. These percentages are based on the number of positions budgeted by the State. Dr. Ronald Shansky, former medical director of the Illinois prison system, concluded that these numbers understate the severity of the crisis because the State has not budgeted sufficient staff to meet demand.[5] According to Dr. Shansky, "even if the prisons were able to fill all of their vacant health care positions, which they have not been able to do to date, . . . the prisons would still be unable to handle the level of need given the current overcrowding." Record in No. 2:90–CV–00520–LKK–JFM (ED Cal.), Doc. 3231–13, p. 16 (hereinafter Doc. 3231–13). Dr. Craig Haney, a professor of psychology, reported that mental health staff are "managing far larger caseloads than is appropriate or effective." App. 596. A prison psychiatrist told Dr. Haney that "'we are doing about 50% of what we should be doing.'" *Ibid.* In the context of physical care Dr. Shansky agreed that "demand for care, particularly for the high priority cases, continues to overwhelm the resources

—————

[5] Dr. Craig Haney likewise testified that the State had "significantly *underestimated* the staffing needed to implement critical portions of the *Coleman* Program Guide requirements," that "key tasks were omitted when determining staffing workloads," and that estimates were based on "key assumptions" that caused the State to underestimate demand for mental health care. App. 596–597.

available." *Id*., at 1408.

Even on the assumption that vacant positions could be filled, the evidence suggested there would be insufficient space for the necessary additional staff to perform their jobs. The *Plata* Receiver, in his report on overcrowding, concluded that even the "newest and most modern prisons" had been "designed with clinic space which is only one-half that necessary for the real-life capacity of the prisons." App. 1023 (emphasis deleted). Dr. Haney reported that "[e]ach one of the facilities I toured was short of significant amounts of space needed to perform otherwise critical tasks and responsibilities." *Id*., at 597–598. In one facility, staff cared for 7,525 prisoners in space designed for one-third as many. Juris. App. 93a. Staff operate out of converted storage rooms, closets, bathrooms, shower rooms, and visiting centers. These makeshift facilities impede the effective delivery of care and place the safety of medical professionals in jeopardy, compounding the difficulty of hiring additional staff.

This shortfall of resources relative to demand contributes to significant delays in treatment. Mentally ill prisoners are housed in administrative segregation while awaiting transfer to scarce mental health treatment beds for appropriate care. One correctional officer indicated that he had kept mentally ill prisoners in segregation for "'6 months or more.'" App. 594. Other prisoners awaiting care are held in tiny, phone-booth sized cages. The record documents instances of prisoners committing suicide while awaiting treatment.[6]

Delays are no less severe in the context of physical care.

---

[6] For instance, Dr. Pablo Stewart reported that one prisoner was referred to a crisis bed but, "[a]fter learning that the restraint room was not available and that there were no crisis beds open, staff moved [the prisoner] back to his administrative segregation cell without any prescribed observation." App. 736. The prisoner "hanged himself that night in his cell." *Ibid.;* see also Juris. App. 99a.

Prisons have backlogs of up to 700 prisoners waiting to see a doctor. Doc. 3231–13, at 18. A review of referrals for urgent specialty care at one prison revealed that only 105 of 316 pending referrals had a scheduled appointment, and only 2 had an appointment scheduled to occur within 14 days. *Id.,* at 22–23. Urgent specialty referrals at one prison had been pending for six months to a year. *Id.,* at 27.

Crowding also creates unsafe and unsanitary living conditions that hamper effective delivery of medical and mental health care. A medical expert described living quarters in converted gymnasiums or dayrooms, where large numbers of prisoners may share just a few toilets and showers, as "'breeding grounds for disease.'"[7] Juris. App. 102a. Cramped conditions promote unrest and violence, making it difficult for prison officials to monitor and control the prison population. On any given day, prisoners in the general prison population may become ill, thus entering the plaintiff class; and overcrowding may prevent immediate medical attention necessary to avoid suffering, death, or spread of disease. After one prisoner was assaulted in a crowded gymnasium, prison staff did not even learn of the injury until the prisoner had been dead for several hours. Tr. 382. Living in crowded, unsafe, and unsanitary conditions can cause prisoners with latent mental illnesses to worsen and develop overt symptoms. Crowding may also impede efforts to improve delivery of

---

[7] Correctional officials at trial described several outbreaks of disease. One officer testified that antibiotic-resistant staph infections spread widely among the prison population and described prisoners "bleeding, oozing with pus that is soaking through their clothes when they come in to get the wound covered and treated." Tr. 601, 604–605. Another witness testified that inmates with influenza were sent back from the infirmary due to a lack of beds and that the disease quickly spread to "more than half" the 340 prisoners in the housing unit, with the result that the unit was placed on lockdown for a week. *Id.*, at 720–721.

care. Two prisoners committed suicide by hanging after being placed in cells that had been identified as requiring a simple fix to remove attachment points that could support a noose. The repair was not made because doing so would involve removing prisoners from the cells, and there was no place to put them. *Id.,* at 769–777. More generally, Jeanne Woodford, the former acting secretary of California's prisons, testified that there "'are simply too many issues that arise from such a large number of prisoners,'" and that, as a result, "'management spends virtually all of its time fighting fires instead of engaging in thoughtful decision-making and planning'" of the sort needed to fashion an effective remedy for these constitutional violations. Juris. App. 82a.

Increased violence also requires increased reliance on lockdowns to keep order, and lockdowns further impede the effective delivery of care. In 2006, prison officials instituted 449 lockdowns. *Id.*, at 116a. The average lockdown lasted 12 days, and 20 lockdowns lasted 60 days or longer. *Ibid.* During lockdowns, staff must either escort prisoners to medical facilities or bring medical staff to the prisoners. Either procedure puts additional strain on already overburdened medical and custodial staff. Some programming for the mentally ill even may be canceled altogether during lockdowns, and staff may be unable to supervise the delivery of psychotropic medications.

The effects of overcrowding are particularly acute in the prisons' reception centers, intake areas that process 140,000 new or returning prisoners every year. *Id.*, at 85a. Crowding in these areas runs as high as 300% of design capacity. *Id.*, at 86a. Living conditions are "'toxic,'" and a lack of treatment space impedes efforts to identify inmate medical or mental health needs and provide even rudimentary care. *Id.*, at 92a. The former warden of San Quentin reported that doctors in that prison's reception center "'were unable to keep up with

physicals or provid[e] any kind of chronic care follow-up.'" *Id.*, at 90a. Inmates spend long periods of time in these areas awaiting transfer to the general population. Some prisoners are held in the reception centers for their entire period of incarceration.

Numerous experts testified that crowding is the primary cause of the constitutional violations. The former warden of San Quentin and former acting secretary of the California prisons concluded that crowding "makes it 'virtually impossible for the organization to develop, much less implement, a plan to provide prisoners with adequate care.'" *Id.*, at 83a. The former executive director of the Texas Department of Criminal Justice testified that "'[e]verything revolves around overcrowding'" and that "'overcrowding is the primary cause of the medical and mental health care violations.'" *Id.*, at 127a. The former head of corrections in Pennsylvania, Washington, and Maine testified that overcrowding is "'overwhelming the system both in terms of sheer numbers, in terms of the space available, in terms of providing healthcare.'" *Ibid.* And the current secretary of the Pennsylvania Department of Corrections testified that "'the biggest inhibiting factor right now in California being able to deliver appropriate mental health and medical care is the severe overcrowding.'" *Id.*, at 82a.

2

The State attempts to undermine the substantial evidence presented at trial, and the three-judge court's findings of fact, by complaining that the three-judge court did not allow it to present evidence of current prison conditions. This suggestion lacks a factual basis.

The three-judge court properly admitted evidence of current conditions as relevant to the issues before it. The three-judge court allowed discovery until a few months before trial; expert witnesses based their conclusions on

recent observations of prison conditions; the court admitted recent reports on prison conditions by the *Plata* Receiver and *Coleman* Special Master; and both parties presented testimony related to current conditions, including understaffing, inadequate facilities, and unsanitary and unsafe living conditions. See *supra*, at 4–8, 19–24. Dr. Craig Haney, for example, based his expert report on tours of eight California prisons. App. 539. These tours occurred as late as August 2008, two weeks before Dr. Haney submitted his report and less than four months before the first day of trial. *Id.,* at 585; see also *id.*, at 563, 565, 580 (July tours). Other experts submitted reports based on similar observations. See, *e.g.*, Doc. 3231–13, at 6 (Dr. Shansky); App. 646 (Dr. Stewart); *id.*, at 1245 (Austin); *id.*, at 1312 (Lehman).

The three-judge court's opinion cited and relied on this evidence of current conditions. The court relied extensively on the expert witness reports. See generally Juris. App. 85a–143a. The court cited the most current data available on suicides and preventable deaths in the California prisons. *Id.*, at 123a, 125a. The court relied on statistics on staff vacancies that dated to three months before trial, *id.*, at 105a, 108a, and statistics on shortages of treatment beds for the same period, *id.*, at 97a. These are just examples of the extensive evidence of current conditions that informed every aspect of the judgment of the three-judge court. The three-judge court did not abuse its discretion when it also cited findings made in earlier decisions of the *Plata* and *Coleman* District Courts. Those findings remained relevant to establish the nature of these longstanding, continuing constitutional violations.

It is true that the three-judge court established a cutoff date for discovery a few months before trial. The order stated that site inspections of prisons would be allowed until that date, and that evidence of "changed prison conditions" after that date would not be admitted. App.

1190. The court also excluded evidence not pertinent to the issue whether a population limit is appropriate under the PLRA, including evidence relevant solely to the existence of an ongoing constitutional violation. The court reasoned that its decision was limited to the issue of remedy and that the merits of the constitutional violation had already been determined. The three-judge court made clear that all such evidence would be considered "[t]o the extent that it illuminates questions that are properly before the court." App. 2339.

Both rulings were within the sound discretion of the three-judge court. Orderly trial management may require discovery deadlines and a clean distinction between litigation of the merits and the remedy. The State in fact represented to the three-judge court that it would be "appropriate" to cut off discovery before trial because "like plaintiffs, we, too, are really gearing up and going into a pretrial mode." *Id.*, at 1683. And if the State truly believed there was no longer a violation, it could have argued to the *Coleman* and *Plata* District Courts that a three-judge court should not be convened because the District Courts' prior orders had not "failed to remedy the deprivation" of prisoners' constitutional rights. 18 U. S. C. §3626(a)(3)(A)(i); see also *supra*, at 16–17. Once the three-judge court was convened, that court was not required to reconsider the merits. Its role was solely to consider the propriety and necessity of a population limit.

The State does not point to any significant evidence that it was unable to present and that would have changed the outcome of the proceedings. To the contrary, the record and opinion make clear that the decision of the three-judge court was based on current evidence pertaining to ongoing constitutional violations.

3

The three-judge court acknowledged that the violations

were caused by factors in addition to overcrowding and that reducing crowding in the prisons would not entirely cure the violations. This is consistent with the reports of the *Coleman* Special Master and *Plata* Receiver, both of whom concluded that even a significant reduction in the prison population would not remedy the violations absent continued efforts to train staff, improve facilities, and reform procedures. App. 487, 1054.[8] The three-judge court nevertheless found that overcrowding was the primary cause in the sense of being the foremost cause of the violation.

This understanding of the primary cause requirement is consistent with the text of the PLRA. The State in fact concedes that it proposed this very definition of primary cause to the three-judge court. "Primary" is defined as "[f]irst or highest in rank, quality, or importance; principal." American Heritage Dictionary 1393 (4th ed. 2000); see also Webster's Third New International Dictionary 1800 (2002) (defining "primary" as "first in rank or importance"); 12 Oxford English Dictionary 472 (2d ed. 1989) (defining "primary" as "[o]f the first or highest rank or importance; that claims the first consideration; principal, chief"). Overcrowding need only be the foremost, chief, or principal cause of the violation. If Congress had intended

_____

[8] The *Plata* Receiver concluded that those who believed a population reduction would be a panacea were "simply wrong." App. 1054–1055. The Receiver nevertheless made clear that "the time this process will take, and the cost and the scope of intrusion by the Federal Court cannot help but increase, and increase in a very significant manner, if the scope and characteristics of [California prison] overcrowding continue." *Id.*, at 1053. The *Coleman* Special Master likewise found that a large release of prisoners, without other relief, would leave the violation "largely unmitigated" even though deficiencies in care "are unquestionably exacerbated by overcrowding" and "defendants' ability to provide required mental health services would be enhanced considerably by a reduction in the overall census" of the prisons. App. 486–487.

to require that crowding be the only cause, it would have said so, assuming in its judgment that definition would be consistent with constitutional limitations.

As this case illustrates, constitutional violations in conditions of confinement are rarely susceptible of simple or straightforward solutions. In addition to overcrowding the failure of California's prisons to provide adequate medical and mental health care may be ascribed to chronic and worsening budget shortfalls, a lack of political will in favor of reform, inadequate facilities, and systemic administrative failures. The *Plata* District Judge, in his order appointing the Receiver, compared the problem to "'a spider web, in which the tension of the various strands is determined by the relationship among all the parts of the web, so that if one pulls on a single strand, the tension of the entire web is redistributed in a new and complex pattern.'" App. 966–967 (quoting Fletcher, The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy, 91 Yale L. J. 635, 645 (1982)); see also *Hutto*, 437 U. S., at 688 (noting "the interdependence of the conditions producing the violation," including overcrowding). Only a multifaceted approach aimed at many causes, including overcrowding, will yield a solution.

The PLRA should not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations. Congress limited the availability of limits on prison populations, but it did not forbid these measures altogether. See 18 U. S. C. §3626. The House Report accompanying the PLRA explained:

> "While prison caps must be the remedy of last resort, a court still retains the power to order this remedy despite its intrusive nature and harmful consequences to the public if, but only if, it is truly necessary to prevent an actual violation of a prisoner's

federal rights." H. R. Rep. No. 104–21, p. 25 (1995).

Courts should presume that Congress was sensitive to the real-world problems faced by those who would remedy constitutional violations in the prisons and that Congress did not leave prisoners without a remedy for violations of their constitutional rights. A reading of the PLRA that would render population limits unavailable in practice would raise serious constitutional concerns. See, *e.g., Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 681, n. 12 (1986). A finding that overcrowding is the "primary cause" of a violation is therefore permissible, despite the fact that additional steps will be required to remedy the violation.

C

The three-judge court was also required to find by clear and convincing evidence that "no other relief will remedy the violation of the Federal right." §3626(a)(3)(E)(ii).

The State argues that the violation could have been remedied through a combination of new construction, transfers of prisoners out of State, hiring of medical personnel, and continued efforts by the *Plata* Receiver and *Coleman* Special Master. The order in fact permits the State to comply with the population limit by transferring prisoners to county facilities or facilities in other States, or by constructing new facilities to raise the prisons' design capacity. And the three-judge court's order does not bar the State from undertaking any other remedial efforts. If the State does find an adequate remedy other than a population limit, it may seek modification or termination of the three-judge court's order on that basis. The evidence at trial, however, supports the three-judge court's conclusion that an order limited to other remedies would not provide effective relief.

The State's argument that out-of-state transfers provide a less restrictive alternative to a population limit must fail

because requiring out-of-state transfers itself qualifies as a population limit under the PLRA.[9]  Such an order "has the purpose or effect of reducing or limiting the prison population, or . . . directs the release from or nonadmission of prisoners to a prison."  §3626(g)(4).  The same is true of transfers to county facilities.  Transfers provide a means to reduce the prison population in compliance with the three-judge court's order.  They are not a less restrictive alternative to that order.

Even if out-of-state transfers could be regarded as a less restrictive alternative, the three-judge court found no evidence of plans for transfers in numbers sufficient to relieve overcrowding.  The State complains that the *Coleman* District Court slowed the rate of transfer by requiring inspections to assure that the receiving institutions were in compliance with the Eighth Amendment, but the State has made no effort to show that it has the resources and the capacity to transfer significantly larger numbers of prisoners absent that condition.

Construction of new facilities, in theory, could alleviate overcrowding, but the three-judge court found no realistic possibility that California would be able to build itself out of this crisis.  At the time of the court's decision the State had plans to build new medical and housing facilities, but funding for some plans had not been secured and funding for other plans had been delayed by the legislature for years.  Particularly in light of California's ongoing fiscal crisis, the three-judge court deemed "chimerical" any "remedy that requires significant additional spending by the state."  Juris. App. 151a.  Events subsequent to the

---

[9] A program of voluntary transfers by the State would, of course, be less restrictive than an order mandating a reduction in the prison population.  In light of the State's longstanding failure to remedy these serious constitutional violations, the three-judge court was under no obligation to consider voluntary population-reduction measures by the State as a workable alternative to injunctive relief.

three-judge court's decision have confirmed this conclusion. In October 2010, the State notified the *Coleman* District Court that a substantial component of its construction plans had been delayed indefinitely by the legislature. And even if planned construction were to be completed, the *Plata* Receiver found that many so-called "expansion" plans called for cramming more prisoners into existing prisons without expanding administrative and support facilities. Juris. App. 151a–152a. The former acting secretary of the California prisons explained that these plans would "'compound the burdens imposed on prison administrators and line staff'" by adding to the already overwhelming prison population, creating new barriers to achievement of a remedy. *Id.*, at 152a.

The three-judge court also rejected additional hiring as a realistic means to achieve a remedy. The State for years had been unable to fill positions necessary for the adequate provision of medical and mental health care, and the three-judge court found no reason to expect a change. Although the State points to limited gains in staffing between 2007 and 2008, the record shows that the prison system remained chronically understaffed through trial in 2008. See *supra*, at 20. The three-judge court found that violence and other negative conditions caused by crowding made it difficult to hire and retain needed staff. The court also concluded that there would be insufficient space for additional staff to work even if adequate personnel could somehow be retained. Additional staff cannot help to remedy the violation if they have no space in which to see and treat patients.

The three-judge court also did not err, much less commit clear error, when it concluded that, absent a population reduction, continued efforts by the Receiver and Special Master would not achieve a remedy. Both the Receiver and the Special Master filed reports stating that overcrowding posed a significant barrier to their efforts. The

*Plata* Receiver stated that he was determined to achieve a remedy even without a population reduction, but he warned that such an effort would "all but bankrupt" the State. App. 1053. The *Coleman* Special Master noted even more serious concerns, stating that previous remedial efforts had "succumbed to the inexorably rising tide of population." App. 489. Both reports are persuasive evidence that, absent a reduction in overcrowding, any remedy might prove unattainable and would at the very least require vast expenditures of resources by the State. Nothing in the long history of the *Coleman* and *Plata* actions demonstrates any real possibility that the necessary resources would be made available.

The State claims that, even if each of these measures were unlikely to remedy the violation, they would succeed in doing so if combined together. Aside from asserting this proposition, the State offers no reason to believe it is so. Attempts to remedy the violations in *Plata* have been ongoing for 9 years. In *Coleman*, remedial efforts have been ongoing for 16. At one time, it may have been possible to hope that these violations would be cured without a reduction in overcrowding. A long history of failed remedial orders, together with substantial evidence of overcrowding's deleterious effects on the provision of care, compels a different conclusion today.

The common thread connecting the State's proposed remedial efforts is that they would require the State to expend large amounts of money absent a reduction in overcrowding. The Court cannot ignore the political and fiscal reality behind this case. California's Legislature has not been willing or able to allocate the resources necessary to meet this crisis absent a reduction in overcrowding. There is no reason to believe it will begin to do so now, when the State of California is facing an unprecedented budgetary shortfall. As noted above, the legislature recently failed to allocate funds for planned new construc-

tion. *Supra*, at 30–31. Without a reduction in overcrowding, there will be no efficacious remedy for the unconstitutional care of the sick and mentally ill in California's prisons.

### D

The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation. 18 U. S. C. §3626(a). When determining whether these requirements are met, courts must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Ibid.*

### 1

The three-judge court acknowledged that its order "is likely to affect inmates without medical conditions or serious mental illness." Juris. App. 172a. This is because reducing California's prison population will require reducing the number of prisoners outside the class through steps such as parole reform, sentencing reform, use of good-time credits, or other means to be determined by the State. Reducing overcrowding will also have positive effects beyond facilitating timely and adequate access to medical care, including reducing the incidence of prison violence and ameliorating unsafe living conditions. According to the State, these collateral consequences are evidence that the order sweeps more broadly than necessary.

The population limit imposed by the three-judge court does not fail narrow tailoring simply because it will have positive effects beyond the plaintiff class. Narrow tailoring requires a "'"fit" between the [remedy's] ends and the means chosen to accomplish those ends.'" *Board of Trus-*

*tees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 480 (1989). The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation. This Court has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution. *Lewis* v. *Casey*, 518 U. S. 343, 357 (1996). But the precedents do not suggest that a narrow and otherwise proper remedy for a constitutional violation is invalid simply because it will have collateral effects.

Nor does anything in the text of the PLRA require that result. The PLRA states that a remedy shall extend no further than necessary to remedy the violation of the rights of a "particular plaintiff or plaintiffs." 18 U. S. C. §3626(a)(1)(A). This means only that the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court.

This case is unlike cases where courts have impermissibly reached out to control the treatment of persons or institutions beyond the scope of the violation. See *Dayton Bd. of Ed.* v. *Brinkman*, 433 U. S. 406, 420 (1977). Even prisoners with no present physical or mental illness may become afflicted, and all prisoners in California are at risk so long as the State continues to provide inadequate care. Prisoners in the general population will become sick, and will become members of the plaintiff classes, with routine frequency; and overcrowding may prevent the timely diagnosis and care necessary to provide effective treatment and to prevent further spread of disease. Relief targeted only at present members of the plaintiff classes may therefore fail to adequately protect future class members who will develop serious physical or mental illness. Prisoners who are not sick or mentally ill do not yet have a claim that they have been subjected to care that violates

the Eighth Amendment, but in no sense are they remote bystanders in California's medical care system. They are that system's next potential victims.

A release order limited to prisoners within the plaintiff classes would, if anything, unduly limit the ability of State officials to determine which prisoners should be released. As the State acknowledges in its brief, "release of seriously mentally ill inmates [would be] likely to create special dangers because of their recidivism rates." Consolidated Reply Brief for Appellants 34. The order of the three-judge court gives the State substantial flexibility to determine who should be released. If the State truly believes that a release order limited to sick and mentally ill inmates would be preferable to the order entered by the three-judge court, the State can move the three-judge court for modification of the order on that basis. The State has not requested this relief from this Court.

The order also is not overbroad because it encompasses the entire prison system, rather than separately assessing the need for a population limit at every institution. The *Coleman* court found a systemwide violation when it first afforded relief, and in *Plata* the State stipulated to systemwide relief when it conceded the existence of a violation. Both the *Coleman* Special Master and the *Plata* Receiver have filed numerous reports detailing systemwide deficiencies in medical and mental health care. California's medical care program is run at a systemwide level, and resources are shared among the correctional facilities.

Although the three-judge court's order addresses the entire California prison system, it affords the State flexibility to accommodate differences between institutions. There is no requirement that every facility comply with the 137.5% limit. Assuming no constitutional violation results, some facilities may retain populations in excess of the limit provided other facilities fall sufficiently below it

so the system as a whole remains in compliance with the
order. This will allow prison officials to shift prisoners
to facilities that are better able to accommodate over-
crowding, or out of facilities where retaining sufficient
medical staff has been difficult. The alternative—a series
of institution-specific population limits—would require
federal judges to make these choices. Leaving this discre-
tion to state officials does not make the order overbroad.

Nor is the order overbroad because it limits the State's
authority to run its prisons, as the State urges in its brief.
While the order does in some respects shape or control the
State's authority in the realm of prison administration, it
does so in a manner that leaves much to the State's discre-
tion. The State may choose how to allocate prisoners
between institutions; it may choose whether to increase
the prisons' capacity through construction or reduce the
population; and, if it does reduce the population, it may
decide what steps to take to achieve the necessary reduc-
tion. The order's limited scope is necessary to remedy a
constitutional violation.

As the State implements the order of the three-judge
court, time and experience may reveal targeted and effec-
tive remedies that will end the constitutional violations
even without a significant decrease in the general prison
population. The State will be free to move the three-judge
court for modification of its order on that basis, and these
motions would be entitled to serious consideration. See
*infra*, at 45–48. At this time, the State has not proposed
any realistic alternative to the order. The State's desire to
avoid a population limit, justified as according respect to
state authority, creates a certain and unacceptable risk of
continuing violations of the rights of sick and mentally ill
prisoners, with the result that many more will die or
needlessly suffer. The Constitution does not permit this
wrong.

2

In reaching its decision, the three-judge court gave "substantial weight" to any potential adverse impact on public safety from its order. The court devoted nearly 10 days of trial to the issue of public safety, and it gave the question extensive attention in its opinion. Ultimately, the court concluded that it would be possible to reduce the prison population "in a manner that preserves public safety and the operation of the criminal justice system." Juris. App. 247a–248a.

The PLRA's requirement that a court give "substantial weight" to public safety does not require the court to certify that its order has no possible adverse impact on the public. A contrary reading would depart from the statute's text by replacing the word "substantial" with "conclusive." Whenever a court issues an order requiring the State to adjust its incarceration and criminal justice policy, there is a risk that the order will have some adverse impact on public safety in some sectors. This is particularly true when the order requires release of prisoners before their sentence has been served. Persons incarcerated for even one offense may have committed many other crimes prior to arrest and conviction, and some number can be expected to commit further crimes upon release. Yet the PLRA contemplates that courts will retain authority to issue orders necessary to remedy constitutional violations, including authority to issue population limits when necessary. See *supra*, at 28–29. A court is required to consider the public safety consequences of its order and to structure, and monitor, its ruling in a way that mitigates those consequences while still achieving an effective remedy of the constitutional violation.

This inquiry necessarily involves difficult predictive judgments regarding the likely effects of court orders. Although these judgments are normally made by state officials, they necessarily must be made by courts when

those courts fashion injunctive relief to remedy serious
constitutional violations in the prisons. These questions
are difficult and sensitive, but they are factual questions
and should be treated as such. Courts can, and should,
rely on relevant and informed expert testimony when
making factual findings. It was proper for the three-judge
court to rely on the testimony of prison officials from
California and other States. Those experts testified on the
basis of empirical evidence and extensive experience in
the field of prison administration.

The three-judge court credited substantial evidence that
prison populations can be reduced in a manner that does
not increase crime to a significant degree. Some evidence
indicated that reducing overcrowding in California's pris-
ons could even improve public safety. Then-Governor
Schwarzenegger, in his emergency proclamation on over-
crowding, acknowledged that "'overcrowding causes harm
to people and property, leads to inmate unrest and mis-
conduct, . . . and increases recidivism as shown within this
state and in others.'" Juris. App. 191a–192a. The former
warden of San Quentin and acting secretary of the Cali-
fornia prison system testified that she "'absolutely be-
lieve[s] that we make people worse, and that we are not
meeting public safety by the way we treat people.'"[10] *Id.*,
at 129a. And the head of Pennsylvania's correctional
system testified that measures to reduce prison population

_____

[10] The former head of correctional systems in Washington, Maine, and
Pennsylvania, likewise referred to California's prisons as "'crimino-
genic.'" Juris. App. 191a. The Yolo County chief probation officer
testified that "'it seems like [the prisons] produce additional criminal
behavior.'" *Id.*, at 190a. A former professor of sociology at George
Washington University, reported that California's present recidivism
rate is among the highest in the Nation. App. 1246. And the three-
judge court noted the report of California's Little Hoover Commission,
which stated that "'[e]ach year, California communities are burdened
with absorbing 123,000 offenders returning from prison, often more
dangerous than when they left.'" Juris. App. 191a.

may "actually improve on public safety because they address the problems that brought people to jail." Tr. 1552–1553.

Expert witnesses produced statistical evidence that prison populations had been lowered without adversely affecting public safety in a number of jurisdictions, including certain counties in California, as well as Wisconsin, Illinois, Texas, Colorado, Montana, Michigan, Florida, and Canada. Juris. App. 245a.[11] Washington's former secretary of corrections testified that his State had implemented population reduction methods, including parole reform and expansion of good time credits, without any "deleterious effect on crime." Tr. 2008–2009. In light of this evidence, the three-judge court concluded that any negative impact on public safety would be "substantially offset, and perhaps entirely eliminated, by the public safety benefits"

—————

[11] Philadelphia's experience in the early 1990's with a federal court order mandating reductions in the prison population was less positive, and that history illustrates the undoubted need for caution in this area. One congressional witness testified that released prisoners committed 79 murders and multiple other offenses. See Hearing on S. 3 et al. before the Senate Committee on the Judiciary, 104th Cong., 1st Sess., 45 (1995) (statement of Lynne Abraham, District Attorney of Philadelphia). Lead counsel for the plaintiff class in that case responded that "[t]his inflammatory assertion has never been documented." *Id.*, at 212 (statement of David Richman). The Philadelphia decree was also different from the order entered in this case. Among other things, it "prohibited the City from admitting to its prisons any additional inmates, except for persons charged with, or convicted of, murder, forcible rape, or a crime involving the use of a gun or knife in the commission of an aggravated assault or robbery." *Harris* v. *Reeves*, 761 F. Supp. 382, 384–385 (ED Pa. 1991); see also Crime and Justice Research Institute, J. Goldkamp & M. White, Restoring Accountability in Pretrial Release: The Philadelphia Pretrial Release Supervision Experiments 6–8 (1998). The difficulty of determining the precise relevance of Philadelphia's experience illustrates why appellate courts defer to the trier of fact. The three-judge court had the opportunity to hear testimony on population reduction measures in other jurisdictions and to ask relevant questions of informed expert witnesses.

of a reduction in overcrowding. Juris. App. 248a.

The court found that various available methods of reducing overcrowding would have little or no impact on public safety. Expansion of good-time credits would allow the State to give early release to only those prisoners who pose the least risk of reoffending. Diverting low-risk offenders to community programs such as drug treatment, day reporting centers, and electronic monitoring would likewise lower the prison population without releasing violent convicts.[12] The State now sends large numbers of persons to prison for violating a technical term or condition of their parole, and it could reduce the prison population by punishing technical parole violations through community-based programs. This last measure would be particularly beneficial as it would reduce crowding in the reception centers, which are especially hard hit by overcrowding. See *supra*, at 23–24. The court's order took account of public safety concerns by giving the State substantial flexibility to select among these and other means of reducing overcrowding.

The State submitted a plan to reduce its prison population in accordance with the three-judge court's order, and it complains that the three-judge court approved that plan without considering whether the specific measures contained within it would substantially threaten public safety. The three-judge court, however, left the choice of how best to comply with its population limit to state

——————

[12] Expanding such community-based measures may require an expenditure of resources by the State to fund new programs or expand existing ones. The State complains that the order therefore requires it to "divert" savings that will be achieved by reducing the prison population and that setting budgetary priorities in this manner is a "severe, unlawful intrusion on the State authority." Brief for Appellants 55. This argument is not convincing. The order does not require the State to use any particular approach to reduce its prison population or allocate its resources.

prison officials. The court was not required to second-guess the exercise of that discretion. Courts should presume that state officials are in a better position to gauge how best to preserve public safety and balance competing correctional and law enforcement concerns. The decision to leave details of implementation to the State's discretion protected public safety by leaving sensitive policy decisions to responsible and competent state officials.

During the pendency of this appeal, the State in fact began to implement measures to reduce the prison population. See Supp. Brief for Appellants 1. These measures will shift "thousands" of prisoners from the state prisons to the county jails by "mak[ing] certain felonies punishable by imprisonment in county jail" and "requir[ing] that individuals returned to custody for violating their conditions of parole 'serve any custody term in county jail.'" *Ibid.* These developments support the three-judge court's conclusion that the prison population can be reduced in a manner calculated to avoid an undue negative effect on public safety.

## III

Establishing the population at which the State could begin to provide constitutionally adequate medical and mental health care, and the appropriate time frame within which to achieve the necessary reduction, requires a degree of judgment. The inquiry involves uncertain predictions regarding the effects of population reductions, as well as difficult determinations regarding the capacity of prison officials to provide adequate care at various population levels. Courts have substantial flexibility when making these judgments. "'Once invoked, "the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies."'" *Hutto*, 437 U. S., at 687, n. 9 (quoting *Milliken* v. *Bradley*, 433 U. S. 267, 281 (1977), in turn quoting *Swann* v.

*Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 15 (1971)).

Nevertheless, the PLRA requires a court to adopt a remedy that is "narrowly tailored" to the constitutional violation and that gives "substantial weight" to public safety. 18 U. S. C. §3626(a). When a court is imposing a population limit, this means the court must set the limit at the highest population consistent with an efficacious remedy. The court must also order the population reduction achieved in the shortest period of time reasonably consistent with public safety.

### A

The three-judge court concluded that the population of California's prisons should be capped at 137.5% of design capacity. This conclusion is supported by the record. Indeed, some evidence supported a limit as low as 100% of design capacity. The chief deputy secretary of Correctional Healthcare Services for the California prisons testified that California's prisons "'were not designed and made no provision for any expansion of medical care space beyond the initial 100% of capacity.'" Juris. App. 176a. Other evidence supported a limit as low as 130%. The head of the State's Facilities Strike Team recommended reducing the population to 130% of design capacity as a long-term goal. *Id.*, at 179a–180a. A former head of correctional systems in Washington State, Maine, and Pennsylvania testified that a 130% limit would "'give prison officials and staff the ability to provide the necessary programs and services for California's prisoners.'" *Id.*, at 180a. A former executive director of the Texas prisons testified that a limit of 130% was "'realistic and appropriate'" and would "'ensure that [California's] prisons are safe and provide legally required services.'" *Ibid.* And a former acting secretary of the California prisons agreed with a 130% limit with the caveat that a 130% limit might prove inadequate in some older facilities. *Ibid.*

According to the State, this testimony expressed the witnesses' policy preferences, rather than their views as to what would cure the constitutional violation. Of course, courts must not confuse professional standards with constitutional requirements. *Rhodes* v. *Chapman*, 452 U. S. 337, 348, n. 13 (1981). But expert opinion may be relevant when determining what is obtainable and what is acceptable in corrections philosophy. See *supra*, at 37–38. Nothing in the record indicates that the experts in this case imposed their own policy views or lost sight of the underlying violations. To the contrary, the witnesses testified that a 130% population limit would allow the State to remedy the constitutionally inadequate provision of medical and mental health care. When expert opinion is addressed to the question of how to remedy the relevant constitutional violations, as it was here, federal judges can give it considerable weight.

The Federal Bureau of Prisons (BOP) has set 130% as a long-term goal for population levels in the federal prison system. Brief for Appellants 43–44. The State suggests the expert witnesses impermissibly adopted this professional standard in their testimony. But courts are not required to disregard expert opinion solely because it adopts or accords with professional standards. Professional standards may be "helpful and relevant with respect to some questions." *Chapman*, *supra*, at 348, n. 13. The witnesses testified that a limit of 130% was necessary to remedy the constitutional violations, not that it should be adopted because it is a BOP standard. If anything, the fact that the BOP views 130% as a manageable population density bolsters the three-judge court's conclusion that a population limit of 130% would alleviate the pressures associated with overcrowding and allow the State to begin to provide constitutionally adequate care.

Although the three-judge court concluded that the "evidence in support of a 130% limit is strong," it found that

some upward adjustment was warranted in light of "the caution and restraint required by the PLRA." Juris. App. 183a, 184a. The three-judge court noted evidence supporting a higher limit. In particular, the State's Corrections Independent Review Panel had found that 145% was the maximum "operable capacity" of California's prisons, *id.*, at 181a–182a, although the relevance of that determination was undermined by the fact that the panel had not considered the need to provide constitutionally adequate medical and mental health care, as the State itself concedes. Brief for Coleman Appellees 45. After considering, but discounting, this evidence, the three-judge court concluded that the evidence supported a limit lower than 145%, but higher than 130%. It therefore imposed a limit of 137.5%.

This weighing of the evidence was not clearly erroneous. The adversary system afforded the court an opportunity to weigh and evaluate evidence presented by the parties. The plaintiffs' evidentiary showing was intended to justify a limit of 130%, and the State made no attempt to show that any other number would allow for a remedy. There are also no scientific tools available to determine the precise population reduction necessary to remedy a constitutional violation of this sort. The three-judge court made the most precise determination it could in light of the record before it. The PLRA's narrow tailoring requirement is satisfied so long as these equitable, remedial judgments are made with the objective of releasing the fewest possible prisoners consistent with an efficacious remedy. In light of substantial evidence supporting an even more drastic remedy, the three-judge court complied with the requirement of the PLRA in this case.

## B

The three-judge court ordered the State to achieve this reduction within two years. At trial and closing argument

before the three-judge court, the State did not argue that reductions should occur over a longer period of time. The State later submitted a plan for court approval that would achieve the required reduction within five years, and that would reduce the prison population to 151% of design capacity in two years. The State represented that this plan would "safely reach a population level of 137.5% over time." App. to Juris. Statement 32a. The three-judge court rejected this plan because it did not comply with the deadline set by its order.

The State first had notice that it would be required to reduce its prison population in February 2009, when the three-judge court gave notice of its tentative ruling after trial. The 2-year deadline, however, will not begin to run until this Court issues its judgment. When that happens, the State will have already had over two years to begin complying with the order of the three-judge court. The State has used the time productively. At oral argument, the State indicated it had reduced its prison population by approximately 9,000 persons since the decision of the three-judge court. After oral argument, the State filed a supplemental brief indicating that it had begun to implement measures to shift "thousands" of additional prisoners to county facilities. Supp. Brief for Appellants at 1.

Particularly in light of the State's failure to contest the issue at trial, the three-judge court did not err when it established a 2-year deadline for relief. Plaintiffs proposed a 2-year deadline, and the evidence at trial was intended to demonstrate the feasibility of a 2-year deadline. See Tr. 2979. Notably, the State has not asked this Court to extend the 2-year deadline at this time.

The three-judge court, however, retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion. "The power of a court of equity to modify a decree of injunctive

relief is long-established, broad, and flexible." *New York State Assn. for Retarded Children, Inc.* v. *Carey*, 706 F. 2d 956, 967 (CA2 1983) (Friendly, J.). A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order. *Id.*, at 969–971. Experience may teach the necessity for modification or amendment of an earlier decree. To that end, the three-judge court must remain open to a showing or demonstration by either party that the injunction should be altered to ensure that the rights and interests of the parties are given all due and necessary protection.

Proper respect for the State and for its governmental processes require that the three-judge court exercise its jurisdiction to accord the State considerable latitude to find mechanisms and make plans to correct the violations in a prompt and effective way consistent with public safety. In order to "give substantial weight to any adverse impact on public safety," 18 U. S. C. §3626(a)(1)(A), the three-judge court must give due deference to informed opinions as to what public safety requires, including the considered determinations of state officials regarding the time in which a reduction in the prison population can be achieved consistent with public safety. An extension of time may allow the State to consider changing political, economic, and other circumstances and to take advantage of opportunities for more effective remedies that arise as the Special Master, the Receiver, the prison system, and the three-judge court itself evaluate the progress being made to correct unconstitutional conditions. At the same time, both the three-judge court and state officials must bear in mind the need for a timely and efficacious remedy for the ongoing violation of prisoners' constitutional rights.

The State may wish to move for modification of the three-judge court's order to extend the deadline for the

required reduction to five years from the entry of the judgment of this Court, the deadline proposed in the State's first population reduction plan. The three-judge court may grant such a request provided that the State satisfies necessary and appropriate preconditions designed to ensure that measures are taken to implement the plan without undue delay. Appropriate preconditions may include a requirement that the State demonstrate that it has the authority and the resources necessary to achieve the required reduction within a 5-year period and to meet reasonable interim directives for population reduction. The three-judge court may also condition an extension of time on the State's ability to meet interim benchmarks for improvement in provision of medical and mental health care.

The three-judge court, in its discretion, may also consider whether it is appropriate to order the State to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release. Even with an extension of time to construct new facilities and implement other reforms, it may become necessary to release prisoners to comply with the court's order. To do so safely, the State should devise systems to select those prisoners least likely to jeopardize public safety. An extension of time may provide the State a greater opportunity to refine and elaborate those systems.

The State has already made significant progress toward reducing its prison population, including reforms that will result in shifting "thousands" of prisoners to county jails. See Supp. Brief for Appellants at 1. As the State makes further progress, the three-judge court should evaluate whether its order remains appropriate. If significant progress is made toward remedying the underlying constitutional violations, that progress may demonstrate that further population reductions are not necessary or are less

urgent than previously believed. Were the State to make this showing, the three-judge court in the exercise of its discretion could consider whether it is appropriate to extend or modify this timeline.

Experience with the three-judge court's order may also lead the State to suggest other modifications. The three-judge court should give any such requests serious consideration. The three-judge court should also formulate its orders to allow the State and its officials the authority necessary to address contingencies that may arise during the remedial process.

These observations reflect the fact that the three-judge court's order, like all continuing equitable decrees, must remain open to appropriate modification. They are not intended to cast doubt on the validity of the basic premise of the existing order. The medical and mental health care provided by California's prisons falls below the standard of decency that inheres in the Eighth Amendment. This extensive and ongoing constitutional violation requires a remedy, and a remedy will not be achieved without a reduction in overcrowding. The relief ordered by the three-judge court is required by the Constitution and was authorized by Congress in the PLRA. The State shall implement the order without further delay.

The judgment of the three-judge court is affirmed.

*It is so ordered.*

## APPENDIXES

A

18 U. S. C. §3626:

"(a) REQUIREMENTS FOR RELIEF.

"(1) PROSPECTIVE RELIEF.—(A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

.          .          .          .          .

"(3) PRISONER RELEASE ORDER.—(A) In any civil action with respect to prison conditions, no court shall enter a prisoner release order unless—

"(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and

"(ii) the defendant has had a reasonable amount of time to comply with the previous court orders.

"(B) In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court in accordance with section 2284 of title 28, if the requirements of subparagraph (E) have been met.

"(C) A party seeking a prisoner release order in Federal court shall file with any request for such relief, a request

for a three-judge court and materials sufficient to demonstrate that the requirements of subparagraph (A) have been met.

"(D) If the requirements under subparagraph (A) have been met, a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered.

"(E) The three-judge court shall enter a prisoner release order only if the court finds by clear and convincing evidence that—

"(i) crowding is the primary cause of the violation of a Federal right; and

"(ii) no other relief will remedy the violation of the Federal right.

"(F) Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall have the right to intervene in any proceeding relating to such relief.

.     .     .     .     .

(g) DEFINITIONS.—As used in this section

.     .     .     .     .

"(4) the term "prisoner release order" includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison . . . ."

Opinion of the Court

B



Mule Creek State Prison
Aug. 1, 2008



California Institution for Men
Aug. 7, 2006

C



Salinas Valley State Prison
July 29, 2008
Correctional Treatment Center (dry cages/holding cells for people wait-
ing for mental health crisis bed)

# SUPREME COURT OF THE UNITED STATES

———————

No. 09–1233

———————

## EDMUND G. BROWN, JR., GOVERNOR OF CAL-IFORNIA, ET AL., APPELLANTS *v*. MARCIANO PLATA ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT AND THE NORTHERN
DISTRICT OF CALIFORNIA

[May 23, 2011]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

Today the Court affirms what is perhaps the most radical injunction issued by a court in our Nation's history: an order requiring California to release the staggering number of 46,000 convicted criminals.

There comes before us, now and then, a case whose proper outcome is so clearly indicated by tradition and common sense, that its decision ought to shape the law, rather than vice versa. One would think that, before allowing the decree of a federal district court to release 46,000 convicted felons, this Court would bend every effort to read the law in such a way as to avoid that outrageous result. Today, quite to the contrary, the Court disregards stringently drawn provisions of the governing statute, and traditional constitutional limitations upon the power of a federal judge, in order to uphold the absurd.

The proceedings that led to this result were a judicial travesty. I dissent because the institutional reform the District Court has undertaken violates the terms of the governing statute, ignores bedrock limitations on the power of Article III judges, and takes federal courts wildly beyond their institutional capacity.

# I

## A

The Prison Litigation Reform Act (PLRA) states that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs"; that such relief must be "narrowly drawn, [and] exten[d] no further than necessary to correct the violation of the Federal right"; and that it must be "the least intrusive means necessary to correct the violation of the Federal right." 18 U. S. C. §3626(a)(1)(A). In deciding whether these multiple limitations have been complied with, it is necessary to identify with precision what is the "violation of the Federal right of a particular plaintiff or plaintiffs" that has been alleged. What has been alleged here, and what the injunction issued by the Court is tailored (narrowly or not) to remedy is the running of a prison system with inadequate medical facilities. That may result in the denial of needed medical treatment to "a particular [prisoner] or [prisoners]," thereby violating (according to our cases) his or their Eighth Amendment rights. But the mere existence of the inadequate system does not subject to cruel and unusual punishment the entire prison population in need of medical care, including those who receive it.

The Court acknowledges that the plaintiffs "do not base their case on deficiencies in care provided on any one occasion"; rather, "[p]laintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to 'substantial risk of serious harm' and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society." *Ante*, at 7, n. 3. But our judge-empowering "evolving standards of decency" jurisprudence (with which, by the way, I heartily disagree, see, *e.g.*,

*Roper* v. *Simmons*, 543 U. S. 551, 615–616 (2005) (SCALIA, J., dissenting)) does not prescribe (or at least has not until today prescribed) rules for the "decent" running of schools, prisons, and other government institutions.  It forbids "indecent" treatment of individuals—in the context of this case, the *denial of medical care* to those who need it.  And the persons who have a constitutional claim for denial of medical care are those who are denied medical care—not all who face a "substantial risk" (whatever that is) of being denied medical care.

The *Coleman* litigation involves "the class of seriously mentally ill persons in California prisons," *ante*, at 8, and the *Plata* litigation involves "the class of state prisoners with serious medical conditions," *ante*, at 9.  The plaintiffs do not appear to claim—and it would absurd to suggest—that every single one of those prisoners has personally experienced "torture or a lingering death," *ante*, at 13 (internal quotation marks omitted), as a consequence of that bad medical system.  Indeed, it is inconceivable that anything more than a small proportion of prisoners in the plaintiff classes have personally received sufficiently atrocious treatment that their Eighth Amendment right was violated—which, as the Court recognizes, is why the plaintiffs do not premise their claim on "deficiencies in care provided on any one occasion."  *Ante*, at 7, n. 3.  Rather, the plaintiffs' claim is that they are all part of a medical system so defective that some number of prisoners will inevitably be injured by incompetent medical care, and that this number is sufficiently high so as to render the system, as a whole, unconstitutional.

But what procedural principle justifies certifying a class of plaintiffs so they may assert a claim of systemic unconstitutionality?  I can think of two possibilities, both of which are untenable.  The first is that although some or most plaintiffs in the class do not *individually* have viable Eighth Amendment claims, the class as a whole has collec-

tively suffered an Eighth Amendment violation. That theory is contrary to the bedrock rule that the sole purpose of classwide adjudication is to aggregate claims that are individually viable. "A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits. And like traditional joinder, it leaves the parties' legal rights and duties intact and the rules of decision unchanged." *Shady Grove Orthopedic Associates, P. A.* v. *Allstate Ins. Co.*, 559 U. S. ___, ___ (2010) (plurality opinion) (slip op., at 14).

The second possibility is that every member of the plaintiff class *has* suffered an Eighth Amendment violation merely by virtue of being a patient in a poorly-run prison system, and the purpose of the class is merely to aggregate all those individually viable claims. This theory has the virtue of being consistent with procedural principles, but at the cost of a gross substantive departure from our case law. Under this theory, each and every prisoner who happens to be a patient in a system that has systemic weaknesses—such as "hir[ing] any doctor who had a license, a pulse and a pair of shoes," *ante*, at 10 (internal quotation marks omitted)—has suffered cruel or unusual punishment, even if that person cannot make an individualized showing of mistreatment. Such a theory of the Eighth Amendment is preposterous. And we have said as much in the past: "If . . . a healthy inmate who had suffered no deprivation of needed medical treatment were able to claim violation of his constitutional right to medical care . . . simply on the ground that the prison medical facilities were inadequate, the essential distinction between judge and executive would have disappeared: it would have become the function of the courts to assure adequate medical care in prisons." *Lewis* v. *Casey*, 518 U. S. 343, 350 (1996).

Whether procedurally wrong or substantively wrong,

the notion that the plaintiff class can allege an Eighth Amendment violation based on "systemwide deficiencies" is assuredly wrong. It follows that the remedy decreed here is also contrary to law, since the theory of systemic unconstitutionality is central to the plaintiffs' case. The PLRA requires plaintiffs to establish that the systemwide injunction entered by the District Court was "narrowly drawn" and "extends no further than necessary" to correct "the violation of the Federal right of a particular plaintiff or plaintiffs." If (as is the case) the only viable constitutional claims consist of individual instances of mistreatment, then a remedy reforming the system as a whole goes far beyond what the statute allows.

It is also worth noting the peculiarity that the vast majority of inmates most generously rewarded by the release order—the 46,000 whose incarceration will be ended—do not form part of any aggrieved class even under the Court's expansive notion of constitutional violation. Most of them will not be prisoners with medical conditions or severe mental illness; and many will undoubtedly be fine physical specimens who have developed intimidating muscles pumping iron in the prison gym.

B

Even if I accepted the implausible premise that the plaintiffs have established a systemwide violation of the Eighth Amendment, I would dissent from the Court's endorsement of a decrowding order. That order is an example of what has become known as a "structural injunction." As I have previously explained, structural injunctions are radically different from the injunctions traditionally issued by courts of equity, and presumably part of "the judicial Power" conferred on federal courts by Article III:

"The mandatory injunctions issued upon termination of litigation usually required 'a single simple act.' H.

McClintock, Principles of Equity §15, pp. 32–33 (2d ed. 1948). Indeed, there was a 'historical prejudice of the court of chancery against rendering decrees which called for more than a single affirmative act.' *Id.,* §61, at 160. And where specific performance of contracts was sought, it was the categorical rule that no decree would issue that required ongoing supervision. . . . Compliance with these 'single act' mandates could, in addition to being simple, be quick; and once it was achieved the contemnor's relationship with the court came to an end, at least insofar as the subject of the order was concerned. Once the document was turned over or the land conveyed, the litigant's obligation to the court, and the court's coercive power over the litigant, ceased. . . . The court did not engage in any ongoing supervision of the litigant's conduct, nor did its order continue to regulate its behavior." *Mine Workers* v. *Bagwell,* 512 U. S. 821, 841–842 (1994) (SCALIA, J., concurring).

Structural injunctions depart from that historical practice, turning judges into long-term administrators of complex social institutions such as schools, prisons, and police departments. Indeed, they require judges to play a role essentially indistinguishable from the role ordinarily played by executive officials. Today's decision not only affirms the structural injunction but vastly expands its use, by holding that an entire system is unconstitutional because it *may produce* constitutional violations.

The drawbacks of structural injunctions have been described at great length elsewhere. See, *e.g., Lewis, supra,* at 385–393 (1996) (THOMAS, J., concurring); *Missouri* v. *Jenkins,* 515 U. S. 70, 124–133 (1995) (THOMAS, J., concurring); Horowitz, Decreeing Organizational Change: Judicial Supervision of Public Institutions, 1983 Duke L. J. 1265. This case illustrates one of their most

pernicious aspects: that they force judges to engage in a form of factfinding-as-policymaking that is outside the traditional judicial role. The factfinding judges traditionally engage in involves the determination of past or present facts based (except for a limited set of materials of which courts may take "judicial notice") exclusively upon a closed trial record. That is one reason why a district judge's factual findings are entitled to clear-error review: because having viewed the trial first hand he is in a better position to evaluate the evidence than a judge reviewing a cold record. In a very limited category of cases, judges have also traditionally been called upon to make some predictive judgments: which custody will best serve the interests of the child, for example, or whether a particular one-shot injunction will remedy the plaintiff's grievance. When a judge manages a structural injunction, however, he will inevitably be required to make very broad empirical predictions necessarily based in large part upon policy views—the sort of predictions regularly made by legislators and executive officials, but inappropriate for the Third Branch.

This feature of structural injunctions is superbly illustrated by the District Court's proceeding concerning the decrowding order's effect on public safety. The PLRA requires that, before granting "[p]rospective relief in [a] civil action with respect to prison conditions," a court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U. S. C. §3626(a)(1)(A). Here, the District Court discharged that requirement by making the "factual finding" that "the state has available methods by which it could readily reduce the prison population to 137.5% design capacity or less without an adverse impact on public safety or the operation of the criminal justice system." Juris. Statement App., O. T. 2009, No. 09-416, p. 253a. It found the evidence "clear" that prison overcrowd-

ing would "perpetuate a criminogenic prison system that itself threatens public safety," *id.,* at 186a, and volunteered its opinion that "[t]he population could be reduced even further with the reform of California's antiquated sentencing policies and other related changes to the laws." *Id.,* at 253a. It "reject[ed] the testimony that inmates released early from prison would commit additional new crimes," *id.,* at 200a, finding that "shortening the length of stay through earned credits would give inmates incentives to participate in programming designed to lower recidivism," *id.,* at 204a, and that "slowing the flow of technical parole violators to prison, thereby substantially reducing the churning of parolees, would by itself improve both the prison and parole systems, and public safety." *Id.,* at 209a. It found that "the diversion of offenders to community correctional programs has significant beneficial effects on public safety," *id.,* at 214a, and that "additional rehabilitative programming would result in a significant population reduction while improving public safety," *id.,* at 216a.

The District Court cast these predictions (and the Court today accepts them) as "factual findings," made in reliance on the procession of expert witnesses that testified at trial. Because these "findings" have support in the record, it is difficult to reverse them under a plain-error standard of review. *Ante*, at 38. And given that the District Court devoted nearly 10 days of trial and 70 pages of its opinion to this issue, it is difficult to dispute that the District Court has discharged its statutory obligation to give "substantial weight to any adverse impact on public safety."

But the idea that the three District Judges in this case relied solely on the credibility of the testifying expert witnesses is fanciful. *Of course* they were relying largely on their own beliefs about penology and recidivism. And *of course* different district judges, of different policy views, would have "found" that rehabilitation would not work

and that releasing prisoners would increase the crime rate. I am not saying that the District Judges rendered their factual findings in bad faith. I am saying that it is impossible for judges to make "factual findings" without inserting their own policy judgments, when the factual findings *are* policy judgments. What occurred here is no more judicial factfinding in the ordinary sense than would be the factual findings that deficit spending will not lower the unemployment rate, or that the continued occupation of Iraq will decrease the risk of terrorism. Yet, because they have been branded "factual findings" entitled to deferential review, the policy preferences of three District Judges now govern the operation of California's penal system.

It is important to recognize that the dressing-up of policy judgments as factual findings is not an error peculiar to this case. It is an unavoidable concomitant of institutional-reform litigation. When a district court issues an injunction, it must make a factual assessment of the anticipated consequences of the injunction. And when the injunction undertakes to restructure a social institution, assessing the factual consequences of the injunction is necessarily the sort of predictive judgment that our system of government allocates to other government officials.

But structural injunctions do not simply invite judges to indulge policy preferences. They invite judges to indulge *incompetent* policy preferences. Three years of law school and familiarity with pertinent Supreme Court precedents give no insight whatsoever into the management of social institutions. Thus, in the proceeding below the District Court determined that constitutionally adequate medical services could be provided if the prison population was 137.5% of design capacity. This was an empirical finding it was utterly unqualified to make. Admittedly, the court did not generate that number entirely on its own; it heard the numbers 130% and 145% bandied about by various

witnesses and decided to split the difference. But the ability of judges to spit back or even average-out numbers spoon-fed to them by expert witnesses does not render them competent decisionmakers in areas in which they are otherwise unqualified.

The District Court also relied heavily on the views of the Receiver and Special Master, and those reports play a starring role in the Court's opinion today. The Court notes that "the Receiver and the Special Master filed reports stating that overcrowding posed a significant barrier to their efforts" and deems those reports "persuasive evidence that, absent a reduction in overcrowding, any remedy might prove unattainable and would at the very least require vast expenditures of resources by the State." *Ante*, at 31–32. The use of these reports is even less consonant with the traditional judicial role than the District Court's reliance on the expert testimony at trial. The latter, even when, as here, it is largely the expression of policy judgments, is at least subject to cross-examination. Relying on the un-cross-examined findings of an investigator, sent into the field to prepare a factual report and give suggestions on how to improve the prison system, bears no resemblance to ordinary judicial decisionmaking. It is true that the PLRA contemplates the appointment of Special Masters (although not Receivers), but Special Masters are authorized only to "conduct hearings and prepare proposed findings of fact" and "assist in the development of remedial plans," 18 U. S. C. §3626(f)(6). This does not authorize them to make factual findings (unconnected to hearings) that are given seemingly wholesale deference. Neither the Receiver nor the Special Master was selected by California to run its prisons, and the fact that they may be experts in the field of prison reform does not justify the judicial imposition of their perspectives on the state.

## C

My general concerns associated with judges' running social institutions are magnified when they run prison systems, and doubly magnified when they force prison officials to release convicted criminals. As we have previously recognized:

> "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. . . . [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. . . . Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Turner* v. *Safley*, 482 U. S. 78, 84–85 (1987) (internal quotation marks omitted).

These principles apply doubly to a prisoner-release order. As the author of today's opinion explained earlier this Term, granting a writ of habeas corpus "'disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.'" *Harrington* v. *Richter*, 562 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 13) (quoting *Harris* v. *Reed*, 489 U. S. 255, 282 (1989) (KENNEDY, J., dissenting)). Recognizing that habeas relief must be granted sparingly, we have reversed the Ninth Circuit's erroneous grant of habeas relief to individual

California prisoners four times this Term alone. *Cullen* v. *Pinholster*, 563 U. S. ___ (2011); *Felkner* v. *Jackson*, 562 U. S. ___ (2011) *(per curiam); Swarthout* v. *Cooke*, 562 U. S. ___ (2011) *(per curiam); Harrington, supra.* And yet here, the Court affirms an order granting the functional equivalent of 46,000 writs of habeas corpus, based on its paean to courts' "substantial flexibility when making these judgments." *Ante*, at 41. It seems that the Court's respect for state sovereignty has vanished in the case where it most matters.

## II

The Court's opinion includes a bizarre coda noting that "[t]he State may wish to move for modification of the three-judge court's order to extend the deadline for the required reduction to five years." *Ante*, at 46–47. The District Court, it says, "may grant such a request provided that the State satisfies necessary and appropriate preconditions designed to ensure the measures are taken to implement the plan without undue delay"; and it gives vague suggestions of what these preconditions "may include," such as "interim benchmarks." *Ante*, at 47. It also invites the District Court to "consider whether it is appropriate to order the State to begin without delay to develop a system to identify prisoners who are unlikely to reoffend," and informs the State that it "should devise systems to select those prisoners least likely to jeopardize public safety." *Ibid.* (What a good idea!)

The legal effect of this passage is unclear—I suspect intentionally so. If it is nothing but a polite reminder to the State and to the District Court that the injunction is subject to modification, then it is entirely unnecessary. As both the State and the District Court are undoubtedly aware, a party is *always* entitled to move to modify an equitable decree, and the PLRA contains an express provision authorizing District Courts to modify or terminate

prison injunctions. See 18 U. S. C. §3626(b).

I suspect, however, that this passage is a warning shot across the bow, telling the District Court that it had *better* modify the injunction if the State requests what we invite it to request. Such a warning, if successful, would achieve the benefit of a marginal reduction in the inevitable murders, robberies, and rapes to be committed by the released inmates. But it would achieve that at the expense of intellectual bankruptcy, as the Court's "warning" is entirely alien to ordinary principles of appellate review of injunctions. When a party moves for modification of an injunction, the district court is entitled to rule on that motion first, subject to review for abuse of discretion if it declines to modify the order. *Horne* v. *Flores*, 557 U. S. \_\_\_, \_\_\_, \_\_\_ (2009) (slip op., at 10, 20). Moreover, when a district court enters a new decree with new benchmarks, the selection of those benchmarks is also reviewed under a deferential, abuse-of-discretion standard of review—a point the Court appears to recognize. *Ante*, at 45. Appellate courts are not supposed to "affirm" injunctions while preemptively noting that the State "may" request, and the District Court "may" grant, a request to extend the State's deadline to release prisoners by three years based on some suggestions on what appropriate preconditions for such a modification "may" include.

Of course what is really happening here is that the Court, overcome by common sense, disapproves of the results reached by the District Court, but cannot remedy them (it thinks) by applying ordinary standards of appellate review. It has therefore selected a solution unknown in our legal system: A deliberately ambiguous set of suggestions on how to modify the injunction, just deferential enough so that it can say with a straight face that it is "affirming," just stern enough to put the District Court on notice that it will likely get reversed if it does not follow them. In doing this, the Court has aggrandized itself,

grasping authority that appellate courts are not supposed
to have, and using it to enact a compromise solution with
no legal basis other than the Court's say-so. That we are
driven to engage in these extralegal activities should be a
sign that the entire project of permitting district courts to
run prison systems is misbegotten.

But perhaps I am being too unkind. The Court, or at
least a majority of the Court's majority, must be aware
that the judges of the District Court are likely to call its
bluff, since they know full well it cannot possibly be an
abuse of discretion to refuse to accept the State's proposed
modifications in an injunction that has just been approved
*(affirmed)* in its present form. An injunction, after all,
does not have to be perfect; only good enough for govern-
ment work, which the Court today says this *is*. So perhaps
the coda is nothing more than a ceremonial washing of the
hands—making it clear for all to see, that if the terrible
things sure to happen as a consequence of this outrageous
order do happen, they will be none of this Court's respon-
sibility. After all, did we not want, and indeed even sug-
gest, something better?

## III

In view of the incoherence of the Eighth Amendment
claim at the core of this case, the nonjudicial features of
institutional reform litigation that this case exemplifies,
and the unique concerns associated with mass prisoner
releases, I do not believe this Court can affirm this injunc-
tion. I will state my approach briefly: In my view, a court
may not order a prisoner's release unless it determines
that the prisoner is suffering from a violation of his consti-
tutional rights, and that his release, and no other relief,
will remedy that violation. Thus, if the court determines
that a particular prisoner is being denied constitutionally
required medical treatment, and the release of that pris-
oner (and no other remedy) would enable him to obtain

medical treatment, then the court can order his release; but a court may not order the release of prisoners who have suffered no violations of their constitutional rights, merely to make it less likely that that will happen to them in the future.

This view follows from the PLRA's text that I discussed at the outset, 18 U. S. C. §3626(a)(1)(A). "[N]arrowly drawn" means that the relief applies only to the "particular [prisoner] or [prisoners]" whose constitutional rights are violated; "extends no further than necessary" means that prisoners whose rights are not violated will not obtain relief; and "least intrusive means necessary to correct the violation of the Federal right" means that no other relief is available.*

I acknowledge that this reading of the PLRA would severely limit the circumstances under which a court could issue structural injunctions to remedy allegedly unconstitutional prison conditions, although it would not eliminate them entirely. If, for instance, a class representing all prisoners in a particular institution alleged that the temperature in their cells was so cold as to violate the Eighth Amendment, or that they were deprived of all exercise time, a court could enter a prisonwide injunction ordering that the temperature be raised or exercise time be provided. Still, my approach may invite the objection that the PLRA appears to contemplate structural injunctions in general and mass prisoner-release orders in particular. The statute requires courts to "give substantial weight to

———————

*Any doubt on this last score, at least as far as prisoner-release orders are concerned, is eliminated by §3626(a)(3)(E) of the statute, which provides that to enter a prisoner-release order the court must find
   "by clear and convincing evidence that—
   (i) crowding is the primary cause of the violation of a Federal right; and
   (ii) no other relief will remedy the violation of the Federal right."

any adverse impact on public safety or the operation of a criminal justice system caused by the relief" and authorizes them to appoint Special Masters, §3626 (a)(1)(A), (f), provisions that seem to presuppose the possibility of a structural remedy. It also sets forth criteria under which courts may issue orders that have "the purpose or effect of reducing or limiting the prisoner population," §3626(g)(4).

I do not believe that objection carries the day. In addition to imposing numerous limitations on the ability of district courts to order injunctive relief with respect to prison conditions, the PLRA states that "[n]othing in this section shall be construed to . . . repeal or detract from otherwise applicable limitations on the remedial powers of the courts." §3626(a)(1)(C). The PLRA is therefore best understood as an attempt to constrain the discretion of courts issuing structural injunctions—not as a mandate for their use. For the reasons I have outlined, structural injunctions, especially prisoner-release orders, raise grave separation-of-powers concerns and veer significantly from the historical role and institutional capability of courts. It is appropriate to construe the PLRA so as to constrain courts from entering injunctive relief that would exceed that role and capability.

\* \* \*

The District Court's order that California release 46,000 prisoners extends "further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs" who have been denied needed medical care. 18 U. S. C. §3626(a)(1)(A). It is accordingly forbidden by the PLRA—besides defying all sound conception of the proper role of judges.

# SUPREME COURT OF THE UNITED STATES

No. 09–1233

EDMUND G. BROWN, JR., GOVERNOR OF CAL-
IFORNIA, ET AL., APPELLANTS *v.* MARCIANO
PLATA ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT AND THE NORTHERN
DISTRICT OF CALIFORNIA

[May 23, 2011]

JUSTICE ALITO, with whom THE CHIEF JUSTICE joins, dissenting.

The decree in this case is a perfect example of what the Prison Litigation Reform Act of 1995 (PLRA), 110 Stat. 1321–66, was enacted to prevent.

The Constitution does not give federal judges the authority to run state penal systems. Decisions regarding state prisons have profound public safety and financial implications, and the States are generally free to make these decisions as they choose. See *Turner* v. *Safley*, 482 U. S. 78, 85 (1987).

The Eighth Amendment imposes an important—but limited—restraint on state authority in this field. The Eighth Amendment prohibits prison officials from depriving inmates of "the minimal civilized measure of life's necessities." *Rhodes* v. *Chapman*, 452 U. S. 337, 347 (1981). Federal courts have the responsibility to ensure that this constitutional standard is met, but undesirable prison conditions that do not violate the Constitution are beyond the federal courts' reach.

In this case, a three-judge court exceeded its authority under the Constitution and the PLRA. The court ordered a radical reduction in the California prison population

without finding that the current population level violates the Constitution.

Two cases were before the three-judge court, and neither targeted the general problem of overcrowding. Indeed, the plaintiffs in one of those cases readily acknowledge that the current population level is not itself unconstitutional. Brief for Coleman Appellees 56. Both of the cases were brought not on behalf of all inmates subjected to over-crowding, but rather in the interests of much more limited classes of prisoners, namely, those needing mental health treatment and those with other serious medical needs. But these cases were used as a springboard to implement a criminal justice program far different from that chosen by the state legislature. Instead of crafting a remedy to attack the specific constitutional violations that were found—which related solely to prisoners in the two plain-tiff classes—the lower court issued a decree that will at best provide only modest help to those prisoners but that is very likely to have a major and deleterious effect on public safety.

The three-judge court ordered the premature release of approximately *46,000 criminals—the equivalent of three Army divisions.*

The approach taken by the three-judge court flies in the face of the PLRA. Contrary to the PLRA, the court's rem-edy is not narrowly tailored to address proven and ongoing constitutional violations. And the three-judge court vio-lated the PLRA's critical command that any court con-templating a prisoner release order must give "substantial weight to any adverse impact on public safety." 18 U. S. C. §3626(a)(1)(A). The three-judge court would have us believe that the early release of 46,000 inmates will not imperil—and will actually improve—public safety. Juris. Statement App., O. T. 2009, No. 09–416, pp. 248a–249a (hereinafter Juris. App.). Common sense and experience counsel greater caution.

I would reverse the decision below for three interrelated reasons. First, the three-judge court improperly refused to consider evidence concerning present conditions in the California prison system. Second, the court erred in holding that no remedy short of a massive prisoner release can bring the California system into compliance with the Eighth Amendment. Third, the court gave inadequate weight to the impact of its decree on public safety.

I

Both the PLRA and general principles concerning injunctive relief dictate that a prisoner release order cannot properly be issued unless the relief is necessary to remedy an ongoing violation. Under the PLRA, a prisoner release may be decreed only if crowding "*is* the primary cause" of an Eighth Amendment violation and only if no other relief "*will* remedy" the violation. §3626(a)(3)(E) (emphasis added). This language makes it clear that proof of past violations alone is insufficient to justify a court-ordered prisoner release.

Similarly, in cases not governed by the PLRA, we have held that an inmate seeking an injunction to prevent a violation of the Eighth Amendment must show that prison officials are "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . into the future." *Farmer* v. *Brennan*, 511 U. S. 825, 846 (1994). The "deliberate indifference" needed to establish an Eighth Amendment violation must be examined "in light of the prison authorities' current attitudes and conduct," *Helling* v. *McKinney*, 509 U. S. 25, 36 (1993), which means "their attitudes and conduct at the time suit is brought and persisting thereafter," *Farmer*, *supra,* at 845.

For these reasons, the propriety of the relief ordered here cannot be assessed without ascertaining the nature and scope of any ongoing constitutional violations. Proof

of past violations will not do; nor is it sufficient simply to establish that *some* violations continue. The scope of permissible relief depends on the scope of any continuing violations, and therefore it was essential for the three-judge court to make a reliable determination of the extent of any violations as of the time its release order was issued. Particularly in light of the radical nature of its chosen remedy, nothing less than an up-to-date assessment was tolerable.

The three-judge court, however, relied heavily on outdated information and findings and refused to permit California to introduce new evidence. Despite evidence of improvement,[1] the three-judge court relied on old findings made by the single-judge courts, see Juris. App. 76a–77a, including a finding made *14 years earlier*, see *id.,* at 170a (citing *Coleman* v. *Wilson*, 912 F. Supp. 1282, 1316, 1319 (ED Cal. 1995)). The three-judge court highlighted death statistics from 2005, see Juris. App. 9a, while ignoring the "significant and continuous decline since 2006," California Prison Health Care Receivership Corp., K. Imai, Analysis of Year 2008 Death Reviews 31 (Dec. 2009) (hereinafter 2008 Death Reviews). And the court dwelled on conditions at a facility that has since been replaced. See Juris. App. 19a–20a, 24a, 89a–90a, 94a, 107a, 111a.

Prohibiting the State from introducing evidence about conditions as of the date when the prisoner release order was under consideration, *id.*, at 76a–78a, and n. 42, the three-judge court explicitly stated that it would not "evaluate the state's continuing constitutional violations." *Id.*, at

---

[1] Before requesting the appointment of a three-judge court, the District Court in *Coleman* recognized "commendable progress" in the State's effort to provide adequate mental health care, Juris. App. 294a, and the District Court in *Plata* acknowledged that "the Receiver has made much progress since his appointment," *id.*, at 280a. The report of the Special Master to which the Court refers, *ante*, at 18–19, identifies a "generally positive trend." App. 803.

77a. Instead, it based its remedy on constitutional defi-ciencies that, in its own words, were found "years ago." *Ibid.*[2]

The three-judge court justified its refusal to receive up-to-date evidence on the ground that the State had not filed a motion to terminate prospective relief under a provision of the PLRA, §3626(b). See Juris. App. 77a. Today's opinion for this Court endorses that reasoning, *ante*, at 26. But the State's opportunity to file such a motion did not eliminate the three-judge court's obligation to ensure that its relief was necessary to remedy ongoing violations.[3] Moreover, the lower court's reasoning did not properly take into account the potential significance of the evidence that the State sought to introduce. Even if that evidence did not show that all violations had ceased—the showing needed to obtain the termination of relief under §3626(b)—that evidence was highly relevant with respect to the nature and scope of permissible relief.[4]

_____

[2] For this reason, it is simply not the case that "evidence of current conditions . . . informed every aspect of the judgment of the three-judge court," as the majority insists, *ante*, at 25.

[3] Because the Ninth Circuit places the burden on the State to prove the absence of an ongoing violation when it moves to terminate pro-spective relief, see *Gilmore* v. *California*, 220 F. 3d 987, 1007 (CA9 2000), even if the State had unsuccessfully moved to terminate pro-spective relief under 18 U. S. C. §3626(b), there would still have been no determination that plaintiffs had carried their burden under the PLRA to establish by clear and convincing evidence that a prisoner release order is necessary to correct an ongoing rights violation.

[4] It is also no answer to say, as the Court now does, *ante*, at 26, that the State had the opportunity to resist the convening of the three-judge court on the ground that there were no unremedied constitutional violations as of that date. See §3626(a)(3)(A)(i). The District Courts granted plaintiffs' motions to convene a three-judge court in 2007, three years before the remedial decree here was issued. Thus, the conditions in the prison system as of the date when the decree was issued were not necessarily the same as those that existed before the three-judge court proceedings began. Moreover, as noted above, even if all of the viola-tions in the system had not been cured at the time of the remedial

The majority approves the three-judge court's refusal to receive fresh evidence based largely on the need for "[o]rderly trial management." *Ante*, at 26. The majority reasons that the three-judge court had closed the book on the question of constitutional violations and had turned to the question of remedy. *Ibid.* As noted, however, the extent of any continuing constitutional violations was highly relevant to the question of remedy.

The majority also countenances the three-judge court's reliance on dated findings. The majority notes that the lower court considered recent reports by the Special Master and Receiver, *ante*, at 18–19, but the majority provides no persuasive justification for the lower court's refusal to receive hard, up-to-date evidence about any continuing violations. With the safety of the people of California in the balance, the record on this issue should not have been closed.

The majority repeats the lower court's error of reciting statistics that are clearly out of date. The Court notes the lower court's finding that as of 2005 "an inmate in one of California's prisons needlessly dies every six to seven days." See *ante*, at 9. Yet by the date of the trial before the three-judge court, the death rate had been trending downward for 10 quarters, App. 2257, and the number of likely preventable deaths fell from 18 in 2006 to 3 in 2007, a decline of 83 percent.[5] Between 2001 and 2007, the

───────────

decree, an accurate assessment of conditions as of that date was essential in order to ensure that the relief did not sweep more broadly than necessary.

[5] 2008 Death Reviews 22. The majority elides the improvement by combining likely preventable deaths with those that were "possibly preventable," *ante*, at 7, n. 4, that is, cases in which "[i]n the judgment of the reviewer," 2008 Death Reviews 3, "it's fifty-fifty that better care would have possibly prevented the death," App. 2277; *id.*, at 2256. As the majority acknowledges, even this class of cases is now dramatically diminished, and the three-judge court must take the current conditions into account when revising its remedy going forward. *Ante*, at 7, n. 4.

California prison system had the 13th lowest average mortality rate of all 50 state systems.[6]

The majority highlights past instances in which particular prisoners received shockingly deficient medical care. See *ante*, at 5, 6–7, 10 (recounting five incidents). But such anecdotal evidence cannot be given undue weight in assessing the current state of the California system. The population of the California prison system (156,000 inmates at the time of trial) is larger than that of many medium-sized cities,[7] and an examination of the medical care provided to the residents of many such cities would likely reveal cases in which grossly deficient treatment was provided. Instances of past mistreatment in the California system are relevant, but prospective relief must be tailored to present and future, not past, conditions.

## II

Under the PLRA, a court may not grant any prospective relief unless the court finds that the relief is narrowly drawn, extends no further than necessary to correct the "violation of [a] Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." §3626(a)(1)(A). In addition, the PLRA prohibits the issuance of a prisoner release order unless the court

—————

[6] Bureau of Justice Statistics, State Prison Deaths, 2001–2007, available at http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=2093 (Table 13) (all Internet materials as visited May 20, 2011, and available in Clerk of Court's case file); see also App. 2257–2258. California had the 14th lowest "'average annual illness mortality [rate] per 100,000 state prisoners from 2001 to 2004.'" Juris. App. 125a. According to a 2007 report, state prisoners had a 19 percent lower death rate than the general U. S. adult population as of 2004. Bureau of Justice Statistics, Medical Causes of Death in State Prisons, 2001–2004, p. 1, available at http://bjs.ojp.usdoj.gov/content/pub/pdf/mcdsp04.pdf.

[7] For example, the population of the California prison system exceeds that of Syracuse, New York; Bridgeport, Connecticut; Springfield, Massachusetts; Eugene, Oregon; and Savannah, Georgia.

finds "by clear and convincing evidence that . . . crowding is the primary cause of the violation of a Federal right" and that "no other relief will remedy the violation of the Federal right." §3626(a)(3)(E).

These statutory restrictions largely reflect general standards for injunctive relief aimed at remedying constitutional violations by state and local governments. "The power of the federal courts to restructure the operation of local and state governmental entities is not plenary. . . . Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Dayton Bd. of Ed.* v. *Brinkman,* 433 U. S. 406, 419–420 (1977) (internal quotation marks omitted).

Here, the majority and the court below maintain that no remedy short of a massive release of prisoners from the general prison population can remedy the State's failure to provide constitutionally adequate health care. This argument is implausible on its face and is not supported by the requisite clear and convincing evidence.

It is instructive to consider the list of deficiencies in the California prison health care system that are highlighted in today's opinion for this Court and in the opinion of the court below. The deficiencies noted by the majority here include the following: "'[e]xam tables and counter tops, where prisoners with . . . communicable diseases are treated, [are] not routinely disinfected,'" *ante*, at 10; medical facilities "'are in an abysmal state of disrepair,'" *ibid.;* medications "'are too often not available when needed,'" *ante*, at 10–11; "'[b]asic medical equipment is often not available or used,'" *ante*, at 10; prisons "would 'hire any doctor who had "a license, a pulse and a pair of shoes,"'" *ibid.;* and medical and mental health staff positions have high vacancy rates, *ante,* at 20. The three-judge court pointed to similar problems. See Juris. App. 93a–121a (citing, among other things, staffing vacancies, too few

beds for mentally ill prisoners, and an outmoded records management system).

Is it plausible that none of these deficiencies can be remedied without releasing 46,000 prisoners? Without taking that radical and dangerous step, exam tables and counter tops cannot properly be disinfected? None of the system's dilapidated facilities can be repaired? Needed medications and equipment cannot be purchased and used? Staff vacancies cannot be filled? The qualifications of prison physicians cannot be improved? A better records management system cannot be developed and implemented?

I do not dispute that general overcrowding *contributes* to many of the California system's healthcare problems. But it by no means follows that reducing overcrowding is the only or the best or even a particularly good way to alleviate those problems. Indeed, it is apparent that the prisoner release ordered by the court below is poorly suited for this purpose. The release order is not limited to prisoners needing substantial medical care but instead calls for a reduction in the system's overall population. Under the order issued by the court below, it is not necessary for a single prisoner in the plaintiff classes to be released. Although some class members will presumably be among those who are discharged, the decrease in the number of prisoners needing mental health treatment or other forms of extensive medical care will be much smaller than the total number of prisoners released, and thus the release will produce at best only a modest improvement in the burden on the medical care system.

The record bears this out. The Special Master stated dramatically that even releasing 100,000 inmates (two-thirds of the California system's entire inmate population!) would leave the problem of providing mental health treatment "largely unmitigated." App. 487. Similarly, the Receiver proclaimed that "'those . . . who think that popu-

lation controls will solve California's prison health care problems . . . are simply wrong.'" Juris. App. 282a.

The State proposed several remedies other than a massive release of prisoners, but the three-judge court, seemingly intent on attacking the broader problem of general overcrowding, rejected all of the State's proposals. In doing so, the court made three critical errors.

First, the court did not assess those proposals and other remedies in light of conditions proved to exist at the time the release order was framed. Had more recent evidence been taken into account, a less extreme remedy might have been shown to be sufficient.

Second, the court failed to distinguish between conditions that fall below the level that may be desirable as a matter of public policy and conditions that do not meet the minimum level mandated by the Constitution. To take one example, the court criticized the California system because prison doctors must conduct intake exams in areas separated by folding screens rather than in separate rooms, creating conditions that "do not allow for appropriate confidentiality." *Id.*, at 88a. But the legitimate privacy expectations of inmates are greatly diminished, see *Hudson* v. *Palmer*, 468 U. S. 517, 525–526 (1984), and this Court has never suggested that the failure to provide private consultation rooms in prisons amounts to cruel and unusual punishment.

Third, the court rejected alternatives that would not have provided "'immediate'" relief. Juris. App. 148a. But nothing in the PLRA suggests that public safety may be sacrificed in order to implement an immediate remedy rather than a less dangerous one that requires a more extended but reasonable period of time.

If the three-judge court had not made these errors, it is entirely possible that an adequate but less drastic remedial plan could have been crafted. Without up-to-date information, it is not possible to specify what such a plan

might provide, and in any event, that is not a task that should be undertaken in the first instance by this Court. But possible components of such a plan are not hard to identify.

Many of the problems noted above plainly could be addressed without releasing prisoners and without incurring the costs associated with a large-scale prison construction program. Sanitary procedures could be improved; sufficient supplies of medicine and medical equipment could be purchased; an adequate system of records management could be implemented; and the number of medical and other staff positions could be increased. Similarly, it is hard to believe that staffing vacancies cannot be reduced or eliminated and that the qualifications of medical personnel cannot be improved by any means short of a massive prisoner release. Without specific findings backed by hard evidence, this Court should not accept the counterintuitive proposition that these problems cannot be ameliorated by increasing salaries, improving working conditions, and providing better training and monitoring of performance.

While the cost of a large-scale construction program may well exceed California's current financial capabilities, a more targeted program, involving the repair and perhaps the expansion of current medical facilities (as opposed to general prison facilities), might be manageable. After all, any remedy in this case, including the new programs associated with the prisoner release order and other proposed relief now before the three-judge court, will necessarily involve some state expenditures.

Measures such as these might be combined with targeted reductions in critical components of the State's prison population. A certain number of prisoners in the classes on whose behalf the two cases were brought might be transferred to out-of-state facilities. The three-judge court rejected the State's proposal to transfer prisoners to

out-of-state facilities in part because the number of proposed transfers was too small. See *id.,* at 160a. See also *ante*, at 30. But this reasoning rested on the court's insistence on a reduction in the State's general prison population rather than the two plaintiff classes.

When the State proposed to make a targeted transfer of prisoners in one of the plaintiff classes (*i.e.,* prisoners needing mental health treatment), one of the District Judges blocked the transfers for fear that the out-of-state facilities would not provide a sufficiently high level of care. See App. 434–440. The District Judge even refused to allow out-of-state transfers for prisoners who volunteered for relocation. See *id.*, at 437. And the court did this even though there was not even an allegation, let alone clear evidence, that the States to which these prisoners would have been sent were violating the Eighth Amendment.

The District Judge presumed that the receiving States might fail to provide constitutionally adequate care, but "'in the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties.'" *United States* v. *Armstrong*, 517 U. S. 456, 464 (1996) (quoting *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1, 14–15 (1926)); *Postal Service* v. *Gregory*, 534 U. S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies"); see also *McKune* v. *Lile*, 536 U. S. 24, 51 (2002) (O'Connor, J., concurring in judgment) ("[W]e may assume that the prison is capable of controlling its inmates so that respondent's personal safety is not jeopardized . . . , at least in the absence of proof to the contrary").[8]

Finally, as a last resort, a much smaller release of pris-

––––––––

[8] The Court rejects the State's argument that out-of-state transfers offer a less restrictive alternative to a prisoner release order because "requiring out-of-state transfers itself qualifies as a population limit under the PLRA." *Ante*, at 29–30. But the PLRA does not apply when the State voluntarily conducts such transfers, as it has sought to do.

oners in the two plaintiff classes could be considered. Plaintiffs proposed not only a systemwide population cap, but also a lower population cap for inmates in specialized programs. Tr. 2915:12–15 (Feb. 3, 2009). The three-judge court rejected this proposal, and its response exemplified what went wrong in this case. One judge complained that this remedy would be deficient because it would protect only the members of the plaintiff classes. The judge stated:

> "The only thing is we would be protecting the class members. And maybe that's the appropriate thing to do. I mean, that's what this case is about, but it would be . . . difficult for me to say yes, and the hell with everybody else." *Id.,* at 2915:23–2916:2.

Overstepping his authority, the judge was not content to provide relief for the classes of plaintiffs on whose behalf the suit before him was brought. Nor was he content to remedy the only constitutional violations that were proved—which concerned the treatment of the members of those classes. Instead, the judge saw it as his responsibility to attack the general problem of overcrowding.

## III

Before ordering any prisoner release, the PLRA commands a court to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." §3626(a)(1)(A). This provision unmistakably reflects Congress' view that prisoner release orders are inherently risky.

In taking this view, Congress was well aware of the impact of previous prisoner release orders. The prisoner release program carried out a few years earlier in Philadelphia is illustrative. In the early 1990's, federal courts enforced a cap on the number of inmates in the Philadelphia prison system, and thousands of inmates were set

free. Although efforts were made to release only those prisoners who were least likely to commit violent crimes, that attempt was spectacularly unsuccessful. During an 18-month period, the Philadelphia police rearrested thousands of these prisoners for committing 9,732 new crimes. Those defendants were charged with 79 murders, 90 rapes, 1,113 assaults, 959 robberies, 701 burglaries, and 2,748 thefts, not to mention thousands of drug offenses.[9] Members of Congress were well aware of this experience.[10]

Despite the record of past prisoner release orders, the three-judge court in this case concluded that loosing 46,000 criminals would not produce a tally like that in Philadelphia and would actually improve public safety. Juris. App. 248a–249a. In reaching this debatable conclusion, the three-judge court relied on the testimony of selected experts, *id.*, at 248a, and the majority now defers to what it characterizes as the lower court's findings of fact on this controversial public policy issue, *ante*, at 15, 19–20, 24.

This is a fundamental and dangerous error. When a

-----

[9] Hearing on Prison Reform before the Senate Committee on the Judiciary, 104th Cong., 1st Sess., 49 (1995) (statement of Lynne Abraham, District Attorney of Philadelphia); Hearings before the Subcommittee on Crime of the House Committee on the Judiciary, 104th Cong., 1st Sess., 259 (1995) (same); see also Hearing before the Subcommittee on Crime, Terrorism, and Homeland Security of the House Committee on the Judiciary, 110th Cong., 2d Sess., 31 (2008) (statement of Sarah V. Hart, Assistant District Attorney, Philadelphia District Attorney's Office).

[10] Condemning the inappropriate imposition of prison population caps, Senator Sarbanes cited "the case of Philadelphia, where a court-ordered prison cap has put thousands of violent criminals back on the city's streets, often with disastrous consequences." 141 Cong. Rec. 26549 (1995). Senator Abraham complained that "American citizens are put at risk every day by court decrees . . . that cure prison crowding by declaring that we must free dangerous criminals before they have served their time." *Id.,* at 26448. "The most egregious example," he added, "is the city of Philadelphia." *Ibid.*

trial court selects between the competing views of experts on broad empirical questions such as the efficacy of preventing crime through the incapacitation of convicted criminals, the trial court's choice is very different from a classic finding of fact and is not entitled to the same degree of deference on appeal.

The particular three-judge court convened in this case was "confident" that releasing 46,000 prisoners pursuant to its plan "would in fact benefit public safety." Juris. App. 248a–249a. According to that court, "overwhelming evidence" supported this purported finding. *Id.,* at 232a. But a more cautious court, less bent on implementing its own criminal justice agenda, would have at least acknowledged that the consequences of this massive prisoner release cannot be ascertained in advance with any degree of certainty and that it is entirely possible that this release will produce results similar to those under prior court-ordered population caps. After all, the sharp increase in the California prison population that the three-judge court lamented, see *id.,* at 254a, has been accompanied by an equally sharp decrease in violent crime.[11] These California trends mirror similar developments at the national level,[12] and "[t]here is a general consensus that the decline in crime is, at least in part, due to more and longer prison sentences."[13] If increased incarceration

––––––––––

[11] From 1992 to 2009, the violent crime rate in California per 100,000 residents fell from 1,119.7 to 472.0—a decrease of 57.8 percent. Similarly, in the United States from 1992 to 2009, the violent crime rate per 100,000 residents fell from 757.7 to 429.4—a decrease of 43.3 percent. Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Reporting Statistics, http://www.ucrdatatool.gov.

[12] According to the three-judge court, California's prison population has increased by 750 percent since the mid-1970's. Juris. App. 254a. From 1970 to 2005, the Nation's prison population increased by 700 percent. Public Safety, Public Spending: Forecasting America's Prison Population 2007–2011, 19 Fed. Sent. Rep. 234, 234 (2007).

[13] Paternoster, How Much Do We Really Know About Criminal Deter-

in California has led to decreased crime, it is entirely possible that a decrease in imprisonment will have the opposite effect.

Commenting on the testimony of an expert who stated that he could not be certain about the effect of the massive prisoner discharge on public safety, the three-judge court complained that "[s]uch equivocal testimony is not helpful." *Id.,* at 247a. But testimony pointing out the difficulty of assessing the consequences of this drastic remedy would have been valued by a careful court duly mindful of the overriding need to guard public safety.

The three-judge court acknowledged that it "ha[d] not evaluated the public safety impact of each individual element" of the population reduction plan it ordered the State to implement. App. to Juris. Statement 3a. The majority argues that the three-judge court nevertheless gave substantial weight to public safety because its order left "details of implementation to the State's discretion." *Ante*, at 41. Yet the State had told the three-judge court that, after studying possible population reduction measures, it concluded that "reducing the prison population to 137.5% within a two-year period cannot be accomplished without unacceptably compromising public safety." Juris. App. 317a. The State found that public safety required a 5-year period in which to achieve the ordered reduction. *Ibid.*

Thus, the three-judge court approved a population reduction plan that neither it nor the State found could be implemented without unacceptable harm to public safety. And this Court now holds that the three-judge court discharged its obligation to "give substantial weight to any adverse impact on public safety," §3626(a)(1)(A), by deferring to officials who did not believe the reduction could be

——————

rence? 100 J. Crim. L. & Criminology 765, 801 (2010) (citing research on this issue).

accomplished in a safe manner. I do not believe the PLRA's public-safety requirement is so trivial.

The members of the three-judge court and the experts on whom they relied may disagree with key elements of the crime-reduction program that the State of California has pursued for the past few decades, including "the shift to inflexible determinate sentencing and the passage of harsh mandatory minimum and three-strikes laws." *Id.,* at 254a. And experts such as the Receiver are entitled to take the view that the State should "re-thin[k] the place of incarceration in its criminal justice system," App. 489. But those controversial opinions on matters of criminal justice policy should not be permitted to override the reasonable policy view that is implicit in the PLRA—that prisoner release orders present an inherent risk to the safety of the public.

*    *    *

The prisoner release ordered in this case is unprecedented, improvident, and contrary to the PLRA. In largely sustaining the decision below, the majority is gambling with the safety of the people of California. Before putting public safety at risk, every reasonable precaution should be taken. The decision below should be reversed, and the case should be remanded for this to be done.

I fear that today's decision, like prior prisoner release orders, will lead to a grim roster of victims. I hope that I am wrong.

In a few years, we will see.